UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____
)
DONALD C. HUTCHINS )
)
Plaintiff )
)        Civil Action: **05-30062-MAP**
v. )
)
FISH & RICHARDSON, P.C. )
)
Defendant )
_____)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT UNDER FED.R.CIV.P.56

## INTRODUCTION

Plaintiff Donald C. Hutchins, ("Hutchins") moves this Court for Summary Judgment on every claim brought against Defendant, Fish & Richardson, P.C. ("F&R") on grounds that:

1.    Plaintiff's claim of Conspiracy must succeed because F&R has not denied the allegation and the undisputed facts show that F&R employees conspired with employees of the Zoll Medical Corporation ("Zoll") to infringe Hutchins' U.S. Patent No. 5,913,685.

2.    Plaintiff's claim of Breach of Contract must succeed because the undisputed facts show that F&R failed in its duty to Plaintiff to fulfill the contractual obligation of filing a patent application in a professional and timely manner.

3.    Plaintiff's claim of Negligence must succeed because F&R has never denied the allegation either prior to or after the institution of this action. The undisputed facts support the claim that the F&R staff did not comply with the standard procedures for patent filing established by the U.S. Patent Office.

4.    Plaintiff's claim of Negligence must succeed because F&R has never denied the allegation either prior to or after the institution of this action. The undisputed facts support the claim that the F&R management did not properly supervise and oversee the author of the patent application.

5.    Plaintiff's claim of Malpractice must succeed because F&R has never denied the allegation. The undisputed facts support the claim that the F&R staff and its Chairman did not assume responsibility for the actions, negligence and contractual obligations of the law firm even when alerted to these failings by Plaintiff.

## **MATERIAL FACTS**

Pursuant to Local Rule 56.1, the following is a concise statement of the material facts of record as to which there are no genuine issues to be tried:

On August 28, 2003 Hutchins met with Attorney Chuck Hieken ("Hieken") at F&R to discuss Hieken's concerns that there was a conflict of interest between Hutchins and the Zoll Medical Corporation within the F&R office. Hieken explained that Attorney G. Roger Lee, a partner at F&R was preparing patent applications for an innovative Zoll defibrillator that included voice and graphic cardiopulmonary prompting (CPR). Hieken's concern was that Attorney Lee had access to privileged information used in the filing of Hutchins' properties such as Hutchins' Patents No. 5,913,685 attached herein as Exhibit A. (Hutchins Affidavit, Ex. F,¶¶ 1,2)

On September 22, 2003 Gary Freeman, the V.P. of Clinical Affairs at Zoll induced Hutchins to participate in an Agreement to allow Attorney Lee to evaluate Hutchins' patents as part of Zoll's request to license Hutchins Patent No. 5,913,685.

Discovery in Civil Action 04-30121-MAP, Donald C. Hutchins vs. Zoll Medical Corporation, reveals that Attorney Lee has participated in the drafting of patent applications for a Zoll device named *AED Plus* and that this device includes CPR voice and graphic prompting. Discovery in Civil Action 04-30121-MAP reveals that Attorney Lee had researched Hutchins' patents long before September 22, 2003 in an effort to write around Hutchins' claims as part of his efforts on behalf of Zoll's *AED Plus*. (Hutchins Affidavit, Ex. F,¶¶ 1,2)

2

The evaluation of Hutchins' Patent No. 5,913,685 was nothing more than concealment to allow Attorney Lee to apply for the *AED Plus* claims related to CPR voice and graphic prompting. The culmination and result of this conspiracy can be clearly seen in Exhibit B attached. This discovery from C.A. 04-30121-MAP is Zoll's Patent Application No. 2004/0176807 showing Gary Freeman as the inventor and F&R as the conspiring patent counsel. Even the untrained eye can see that most of the Figures, Descriptions and Claims are copied from Plaintiff's Patent shown as Exhibit A.

Before leaving the meeting on August 28, 2003, Attorney Hieken became excited with an "escape light" that Hutchins had developed in reaction to the September 11th twin towers disaster. Before Hutchins left the office, Hieken encouraged Hutchins to do a patent search and get back to him because Hieken believed that this escape light was a patentable device. (Hutchins Affidavit, Ex. F,¶ 2)

Hutchins has been a client of Attorney Hieken for over 20 years and Hutchins has paid fees to Fish & Richardson of over $200,000 in that period to obtain numerous patents, re-issue patents, copyrights, foreign patents, etc. Stimulated by Attorney Hieken's belief that this "escape light" included patentable innovations, Hutchins did an exhaustive patent search. When the search showed that Hutchins' "escape light" inventions were unique and patentable, Hutchins wrote a draft that included the circuit design, drawings, patent search, background and objects of the invention for the "escape light' and asked F&R to write the claims. (Hutchins Affidavit, Ex. F,¶ 3)

Sometime later Hutchins received a request for additional technical data from Attorney David Miranda ("Miranda") who was assisting Attorney Hieken with the "escape light" patent application. Attorney Miranda explained in a letter to Hutchins that the application would be reviewed by the Patent Office within 12 to 18 months.

Attorney Hieken sent Hutchins a copy of the Patent Office response to the "escape light" patent application in a document called the "Office Action" in January of 2005 that is attached herein as Exhibit C. The Examiner rejected the title, all the claims and found every other aspect of the Application incomprehensible.

F&R's cover sheet showed that the Office Action was stamped as received by F&R October 22, 2004. The stamp by F&R's Practice Systems showed a Base Date of 10-20-

the three-month period for a response to the Patent Office had expired. Hutchins reacted by communicating the problem to Attorney Hieken by e-mail attached as Exhibit D. In reply, Attorney Hieken acknowledged that the F&R staff had failed to meet the response date and volunteered to prepare a response over the weekend. When Hutchins telephoned Attorney Miranda, Hutchins learned that Attorney Miranda was no longer employed by F&R. In his review of the Office Action and rejected title and claims, Hutchins found that Attorney Miranda did not use the material that Hutchins had prepared. Miranda wrote an incomprehensible application that is totally unrelated to Hutchins' "escape light' invention. (Hutchins Affidavit, Ex. F,¶¶ 3,4)

Unable to communicate with Miranda, Hutchins sent a letter and Robert E. Hillman Esq. the Chairman of F&R and included Hutchins' response to the Office Action. Hutchins hoped that Attorney Hillman would take responsibility for F&R's negligent acts and press the Patent Office for an extension. This letter to the Chairman and Hutchins' response to the Office Action is included as Exhibit E. (Hutchins Affidavit, Ex. F,¶ 4)

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Hutchins must establish, on a motion for summary judgment, that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. id. at 324. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 30 (1st Cir. 1990) (citing Fed R. Civ. P.56( c )).

## ARGUMENT

I.    Zoll contracted with Hutchins to use the services of Attorney Lee for the purposes of licensing Hutchins' intellectual properties. It is apparent that Freeman was investigating Hutchins' inventions to gain information for a competitive patent that Zoll was pursuing. Attorney G. Roger Lee, a partner at F&R conspired with Freeman to prepare a patent application for an innovative Zoll defibrillator that included voice and graphic cardiopulmonary prompting (CPR) using information available to him as a

4

partner in F&R and through documents provided to Zoll by Hutchins during license negotiations. Proof of this conspiracy is Freeman's Patent Application. Attorney Lee's conduct and the embezzlement of Hutchins' inventions by Zoll is truly a breach of trust and of contract as is demonstrated by the patent application attached as Exhibit B.

II.      Under current patent law, an inventor contracts with a patent law firm to evaluate the patentability of an invention through tests of novelty and patent search. Having satisfied these requirements, the patent attorney contracts to write the patent application and to file the application with the U.S. Patent Office according to procedures and deadlines established by that Office. The inventor is billed as this process proceeds. Hutchins is familiar with these procedures because he has successfully contracted with F&R in the filing of both U.S. and foreign applications over the past 20 years. F&R breached their contract with Hutchins and the application process failed because F&R did not file to patent application in a professional and timely manner.

III.     The Patent Office Examiner responds to a filing within 12 to 18 months with a document called an "Office Action" that includes specific dates in which a response is demanded. When these response dates are not met, the Patent Office considers that the patent application is abandoned and the patent is automatically denied. Negligence on the part of the F&R staff caused the Office Action response dates to pass with no response. This negligence caused the patent application to fail depriving Hutchins of protection for his invention.

IV.     The patent application written by Attorney Miranda is unsuitable and totally devoid of merit as testified to the Examiner's comments found in the Office Action. F&R owes a duty to all its clients, including Hutchins, to hire, train, maintain, evaluate and supervise a staff of attorneys capable of filing a patent. The record shows that Attorney Miranda was incapable of filing a patent acceptable to the average Patent Office Examiner. F&R negligence in not supervising and overseeing the efforts of Miranda have cost Hutchins the ownership of a valuable property and left Hutchins very little opportunity to recover the massive amounts of time and money that his "escape light" invention has cost him.

V.      On February 23, 2005 Hutchins sent a letter and supporting materials by UPS overnight to Mr. Robert E. Hillman, Esq. the Chairman of F&R with the hope of saving

the "escape light" patent. The letter, which is attached herein as Exhibit C, ended, "If Fish & Richardson is willing to underwrite the cost of re-submittal and can persuade the Examiner that the original application was flawed, I would be happy to work with you."

Chairman Hillman and F&R owed a duty to Hutchins to assume responsibility for the actions, negligence and contractual obligations of the law firm. By not responding to Hutchins, Chairman Hillman has refused to assume responsibility for the acts of malpractice perpetrated against Hutchins that resulted in Hutchins loosing any possibility of gaining an "escape light" patent in a last minute re-submittal effort. Chairman Hillman's complete disregard to Hutchins plea for help has lost Hutchins any chance for a patent and forced these issues into costly litigation.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully submits that he is entitled to Summary Judgment on all claims at issue, as a matter of law, because the undisputed facts show that Fish & Richardson, P.C. has not denied any of the allegations found in the Complaint. F&R's only response has been to file for dismissal on grounds of jurisdiction in an attempt thwart justice by depleting Plaintiff's resolve and resources

There are no genuine issues as to any material facts and that are entitled to judgment as a matter of law. Hutchins verifies these undisputed facts with his sworn Affidavit attached as Exhibit F. Accordingly, Hutchins respectfully requests that this Court grant his motion for summary judgment.

Respectfully submitted

The Plaintiff
Donald C. Hutchins, Pro Se

Dated: July 7, 2005

1047 Longmeadow Street
Longmeadow, Massachusetts 01106
(413) 567-0606
(413) 739-4060 (facsimile)

6

page

## CERTIFICATE OF SERVICE

I, Donald C. Hutchins, 1047 Longmeadow Street, Longmeadow, Massachusetts 01106, hereby certify that I served a copy of the foregoing on the appropriate party by sending a copy by United Parcel Service to Richard W. Renehan, Esq., Goulston & Storrs P.C., 400 Atlantic Ave., Boston, MA 02110.

Dated: 7/7/05

Donald C. Hutchins

# EXHIBIT A

US005913685A

# United States Patent [19]

## Hutchins

| [11] | Patent Number: | 5,913,685 |
|---|---|---|
| [45] | Date of Patent: | Jun. 22, 1999 |

[54] **CPR COMPUTER AIDING**

[76] Inventor: **Donald C. Hutchins**, 60 Brookdale Dr., Springfield, Mass. 01104

[21] Appl. No.: **08/667,946**

[22] Filed: **Jun. 24, 1996**

[51] Int. Cl.⁶ ................................................. G09B 23/28
[52] U.S. Cl. ................................................. 434/265
[58] Field of Search ............................... 434/262, 265, 434/307 R, 308, 323

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| Re. 34,800 | 11/1994 | Hutchins | 128/898 |
|---|---|---|---|
| 1,918,041 | 7/1933 | Knapke . | |
| 3,520,071 | 7/1970 | Abrahamson et al. | 35/17 |
| 3,552,036 | 1/1971 | Mahler | 35/17 |
| 3,736,363 | 5/1973 | Baessler et al. | 35/17 |
| 4,000,565 | 1/1977 | Overby et al. | 35/35 A |
| 4,016,540 | 4/1977 | Hyatt | 340/172.5 |
| 4,020,468 | 4/1977 | Silver et al. | 340/172.5 |
| 4,023,276 | 5/1977 | Furukawa et al. | 33/1 C |
| 4,052,798 | 10/1977 | Tomita et al. | 35/9 A |
| 4,060,915 | 12/1977 | Conway | 35/9 A |
| 4,094,079 | 6/1978 | Dorsett | 35/8 A |
| 4,095,590 | 6/1978 | Harrigan | 128/24 R |
| 4,101,883 | 7/1978 | Hempenius et al. | 340/365 R |
| 4,110,918 | 9/1978 | James et al. | 35/22 R |
| 4,193,064 | 3/1980 | Snyder | 340/309.4 |
| 4,290,114 | 9/1981 | Sinay | 364/900 |
| 4,302,193 | 11/1981 | Haynes | 434/178 |
| 4,307,728 | 12/1981 | Walton | 128/687 |
| 4,331,426 | 5/1982 | Sweeney | 434/265 |
| 4,360,345 | 11/1982 | Hon | 434/262 |
| 4,370,983 | 2/1983 | Lichtenstein | 128/630 |
| 4,420,813 | 12/1983 | Inoue et al. | 364/513 |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| 0 186 713 | 7/1986 | European Pat. Off. . |
|---|---|---|
| 3638-192 | 5/1988 | Germany . |
| 57-8418 | 1/1982 | Japan . |
| 501-409 | 4/1976 | U.S.S.R. . |
| WO 91/15007 | 10/1991 | WIPO . |
| WO 91/15267 | 10/1991 | WIPO . |

### OTHER PUBLICATIONS

"ADA Directions" newsletter, vol. II, Issue 2 & 3, Summer & Fall 1995.

Primary Examiner—Robert A. Hafer
Assistant Examiner—John Edmund Rovnak
Attorney, Agent, or Firm—Fish & Richardson P.C.

[57] **ABSTRACT**

A cardiopulmonary resuscitation (CPR) aiding computer system provides guidance to rescue personnel trained in CPR for resuscitating a victim under an emergency condition. The system includes an input for entering information signals representative at least of characteristics of the victim relevant to proper performance of CPR techniques, a processing unit responsive to the information signals and for providing output signals representative of proper steps to be taken in resuscitating the victim, and an output, including a display, responsive to the output signals and for providing guidance signals, which include visible signals, such as animated images, on the display, of the proper steps to be taken by the rescue personnel in resuscitating the victim. In one embodiment, the output includes an audio system for producing audible guidance in response to the output signals, wherein the speech guidance is synchronized with the visible guidance. The system can be configured as a personal computer, or as a network of terminals and computers.

**43 Claims, 13 Drawing Sheets**

Microfiche Appendix Included
(1 Microfiche, 36 Pages)



5,913,685
Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,457,312 | 7/1984 | Ornato et al. | 128/711 |
| 4,472,146 | 9/1984 | Weissbrod | 434/365 |
| 4,489,387 | 12/1984 | Lamb et al. | 364/514 |
| 4,510,942 | 4/1985 | Miyamae et al. | 128/680 |
| 4,531,310 | 7/1985 | Acson et al. | 40/1.5 |
| 4,583,524 | 4/1986 | Hutchins | 128/1 R |
| 4,588,383 | 5/1986 | Parker et al. | 434/265 |
| 4,797,104 | 1/1989 | Laerdal et al. | 434/263 |
| 4,863,385 | 9/1989 | Pierce | 434/263 |
| 5,088,037 | 2/1992 | Battaglia | 364/413.01 |
| 5,223,828 | 6/1993 | McKiel, Jr. | 340/825.19 |
| 5,239,988 | 8/1993 | Swanson et al. | 128/28 |
| 5,305,374 | 4/1994 | Snyder | 379/88.06 |
| 5,345,705 | 9/1994 | Lawrence | 40/616 |
| 5,365,686 | 11/1994 | Scott | 40/455 |
| 5,394,892 | 3/1995 | Kenny et al. | 128/897 |
| 5,409,380 | 4/1995 | Balbuena et al. | 434/112 |
| 5,412,189 | 5/1995 | Cragun | 235/379 |
| 5,417,574 | 5/1995 | Raynes | 434/112 |

Copy provided by USPTO from the PIRS Image Database on 04-17-2003



FIG. 1



FIG. 2

Copy provided by USPTO from the PIRS Image Database on 04-17-2003



FIG. 3



FIG. 4A



FIG. 4B

Copy provided by USPTO from the PIRS Image Database on 04-17-2003



FIG. 4C



FIG. 4D

**U.S. Patent**          Jun. 22, 1999          Sheet 6 of 13          **5,913,685**



FIG. 4E

Copy provided by USPTO from the PIRS Image Database on 04-17-2003



FIG. 4F



FIG. 4G



260

| | | | |
|---|---|---|---|
| ▽ | △ | ON | OFF |
| | | POWER | |
| ADULT | | 🧍 | A |
| INFANT/BABY | | 🔧 | B |
| CHILD | | 🧍 | C |
| ONE RESCUER CPR | | 🔧 | 1 |
| TWO RESCUER CPR | | 🔧🔧 | 2 |
| MOUTH TO MOUTH | | 🔧 | 3 |
| CHOKING CONSCIOUS | | 🔧 | 4 |
| CHOKING UNCONSCIOUS | | 🔧 | 5 |
| PAUSE | | 🕭 | P |

Time: 3:44:32 PM

234
212
252
254

## FIG. 4H

Copy provided by USPTO from the PIRS Image Database on 04-17-2003



FIG. 4I



FIG. 4J



FIG. 4K



FIG. 4L



FIG. 4M



FIG. 4N



FIG. 4O

FIG. 4P



FIG. 5

5,913,685

1

## CPR COMPUTER AIDING

A microfiche appendix containing Lingo language source code for operating a Macintosh® computer according to the invention, consisting of 36 microfiche images on one microfiche card is filed herewith.

The invention relates to cardiopulmonary resuscitation (CPR) aiding, and, in particular to computer aiding rescue personnel conducting CPR on a subject by providing visible and intelligible audible information to the rescue personnel in response to input from the rescue personnel regarding the condition of the subject.

For background reference is made to Hutchins U.S. Pat. Nos. 4,583,524 and RE 34,800 which disclose, in a portable CPR aiding device, the use of synthetic electronic speech and microprocessor logic to help guide rescuers through CPR procedures in emergency conditions by providing audible information with the proper timing and sequencing.

For many years, personal computer and/or computer work station terminals have been used in schools, work places and other locations. Such terminals typically include a display device with graphics capability, and many have a "sound card" for producing a broad range of audio signals. Laser disk systems can be coupled to a computer for displaying high quality graphic images. Many computers are also capable of linking with other computers via hard-wire or wireless systems. For example, a local area network (LAN) may include several personal computers linked to a network server via a hard-wire connection, such as, for example, an ETHERNET® or token-ring system. Individual computers can communicate with remote computers or networks via telephone links with modem connections.

An important object of the invention is to provide CPR computer aiding for providing guidance to rescue personnel trained in CPR for resuscitating a victim under emergency conditions.

According to the invention, a computer system, such as a multimedia computer terminal, is configured as a CPR audio and visual aiding device. The terms "CPR," "CPR procedure" and "CPR techniques" as used herein embrace cardiopulmonary resuscitation, including mouth-to-mouth resuscitation and aiding choking victims. The computer terminal broadcasts audible and visible signals to allow rescuers full use of hands, eyes, voice, mouth, and body while being guided through a rescue with the proper timing for each resuscitation step. Rescue personnel can enter into an input of the computer terminal information signals representative at least of characteristics of a victim relevant to proper performance of CPR techniques. The information signals can indicate the age group of the victim, the number of rescuers present, and a selected CPR procedure. The computer processing unit responds to the information signals to output stored signals representative of proper steps to be taken in resuscitating or aiding the victim. An output, which includes a display, is responsive to the output signals and provides rescue aiding guidance signals, which include visible signals on the display, of the proper steps to be taken by the rescue personnel in resuscitating or aiding the victim. The visible signals can include a pictorial representation, which may be animated, of a rescuer practicing the proper steps on a victim. The output can further include an electroacoustical transducer responsive to the output signals for providing audible intelligible signals representative of the proper steps, and synchronized with the visible signals.

According to another aspect of the invention, a peripheral unit, such as, for example, a multimedia computer terminal, can be networked with other peripheral units, each

2

having an input for entering the information signals and an output that includes a display. In one configuration, a network server responsive to the information signals provides output signals representative of the proper steps to be taken in resuscitating or aiding the victim. A communication link communicates the information signals from the peripheral units to the network server and the output signals from the server to the peripheral unit sending the corresponding information signal. In response to the output signals, the output of the peripheral unit provides guidance signals, including visible guidance on the display, representative of the proper steps. The visible guidance can be synchronized with audible intelligible guidance broadcast by an electroacoustic transducer.

According to yet another aspect of the invention, CPR aiding guidance signals are stored in a computer readable medium coupled to the computer system. The computer readable medium could be, for example, an integrated circuit memory, a tape cassette, a hard disk drive, a floppy disk, an optical disk, a bubble memory, a CD-ROM, and the like.

According to still another feature of the invention, the output display monitor of the terminal displays a menu, for example, in the form of a touch keypad, with which the rescuer could input the information signal via, e.g. a mouse, a touch-screen, keystrokes on a keyboard, and the like. This menu/keypad can be divided graphically by the age category of the victim, such as Adult, Baby, and Child. It can be further divided into rescue procedures, such as One Rescuer CPR, Two Rescuer CPR, Mouth to Mouth Resuscitation, Choking Conscious, and Choking Not Conscious procedures.

Another feature of the invention is that it enables the rescuer to quickly change the CPR aiding prompts by entering new information signals should the condition of the victim or number of rescuers change.

According to yet another feature of the invention, the computer system is configured to permit rescue personnel to select the language of the intelligible audible signals, thus allowing for international availability and use, the system being capable of supporting different languages.

According to another aspect of the invention, the CPR aiding computer system further includes a screen saver computer program. The CPR aiding screen saver keeps pixels active on the screen during idle moments so that CPR computer aiding will be instantly available from the computer terminal by entering a simple command, for example, entering a keystroke.

According to still another aspect of the invention, the CPR aiding computer system is configured to furnish a diary of a rescue. The diary may include information entered by rescue personnel, information recorded automatically by the computer processor or network server, or both.

In still another feature of the invention, the CPR aiding computer system is configured to furnish an accurate run time of the rescue on the computer video display terminal. Upon rescue personnel entering the information signals at the start of a rescue, a window on the computer screen could show the elapsed time. For example, the computer screen could show a stop watch timer or a digital display of the elapsed time.

According to another aspect of the invention, an article of manufacture includes a computer usable medium that has a computer readable program code embodied therein for providing guidance signals to rescue personnel trained in CPR under emergency conditions for aiding a victim. The computer readable program code in the article of manufacture includes computer readable program code for causing a

5,913,685

3

computer to display visible signals representative of proper steps to be taken by the rescue personnel in resuscitating the victim in response to an information signal input by the rescue personnel. The information signal is representative at least of characteristics of the victim relevant to proper performance of CPR techniques.

According to yet another aspect of the invention, a computer program provides guidance signals to rescue personnel trained in CPR under emergency conditions for aiding a victim requiring CPR techniques. The computer program is stored on a media readable by a general purpose computer, and configures the computer upon being read and executed by the computer to perform functions that include allowing the rescue personnel to input an information signal representative at least of characteristics of the victim relevant to proper performance of CPR techniques, and displaying visible signals representative of proper steps to be taken by the rescue personnel in resuscitating the victim in response to the information signal input by the rescue personnel.

A further feature of the invention is to use a bridge that links two local area networks together so they can share CPR aiding software. A more sophisticated bridge that could be used is a router or a cross between a bridge and router which is a brouter. All can be used to perform some of the same functions for the CPR network.

Computers and computer terminals are already in place in locations available to persons trained for CPR rescues. The CPR aiding computer system of the invention can be implemented in many of these systems by simply loading a CPR aiding computer program into a computer memory. CPR prompting is a small adjunct to the principal use of the computer terminal which may be, for example, accounting, engineering, entertainment, or education. Such general purpose computers, when configured according to the invention, can furnish instant access to CPR speech and visual prompting. Computer networks provide a means for distributing access to CPR aiding to remote locations.

Numerous other features, objects, and advantages of the invention will become apparent from the following specification when read in connection with the accompanying drawings in which:

FIG. 1 is a block diagram of a CPR aiding computer according to the invention;

FIG. 2 is a block diagram of a CPR aiding computer network according to the invention;

FIG. 3 is an initial display screen according to the invention;

FIGS. 4A-4P are illustrations of output screens displaying graphic CPR prompts; and

FIG. 5 is a functional block diagram illustrating synchronization of animated image and intelligible audible prompts in a coordinated format.

With reference now to FIG. 1, a multi-media personal computer 10 configured according to the invention includes a central processing unit (CPU) 12 that is operatively coupled to read only memory (ROM) 14 and random access memory (RAM) 16. CPU 12 is also coupled to one or more data storage systems for accessing computer readable media, such as, for example, hard disk drive 18, diskette drive 20, laser disk drive 22, and the like. At least one of the data storage systems also typically has the capability to write data onto the computer readable medium. Personal computer 10 has a display 24 capable of displaying graphic images and text, and a sound manager system 26 capable of speech synthesis. Sound manager system 26 is coupled to a speaker 28 and a microphone 30. Computer 10 also includes one or

4

more input devices, such as, for example, a keyboard 32, a mouse 34, a touch screen 36, a screen pointer 38 and, in an exemplary configuration, a voice recognition device 40, which may form a part of the sound manager system 26. Computer 10 may also include one or more interfaces for communicating with another computer or a computer network. The interfaces may include, for example, a modem 42 for communication via a telephone system 44, a hard-wire interface 46, such as an ETHERNET® or a token-ring interface, to a local area network (LAN) 48 or may be any other type of computer communication interface now known or to be developed in the future. The LAN 48 may, in turn, be able to communicate with more remote units via a telephone system 44 or other type of long distance communication system. Interface 46 may also connect computer 10 to another processor 50 for parallel processing information. Devices such as modem 42 and sound manager 26 typically couple to CPU 12 via communication ports 52 built into computer 10.

The telephone system 44 may include links over hard-wired connections, e.g. via copper cable or optical fibers, and wireless connections, e.g. via cellular phone systems or via satellite radio links. Computer system 10 can also be connected to the Internet via a modem 42 connection to the telephone system 44.

CPU 12 is connected to and controls the sound manager 26 by selecting digitized sound signal data stored in memory and passing them to sound manager 26. Sound manager 26 passes the digital sound signal data through a synthesizer and digital-to-analog (D/A) converter and thereafter through a sound processor. At this point, the sound signals can be broadcast as speech through speaker 28 or sent through a bus, or network to be used with graphics to provide CPR speech prompting.

Another method to input and output sound is through the serial ports 52 in the form of MIDI (Musical instrument data interface) signals. MIDI signals differ from signals moving through the sound ports in that they are digital, rather than analog. Because they are digital, selected portions of the MIDI signals can be random-accessed.

Graphic files containing images and text can be created using a variety of commercially available products. Graphic images and text can be stored in separate files in computer memory and randomly accessed to provide the current CPR prompting illustration. These sequenced images receive the proper geometry, plus color, and are processed through a graphic processor, such as a Quick Draw® processor for Macintosh computers, for subsequent display on video display 24. Chroma-keying technique text can be used over graphics and video to achieve greater emphasis with the visual CPR prompt.

FIG. 5 is a logical diagram illustrating the steps in coordinating the CPU 12, the sound manager 26, and Quick Draw processor 60. A circuit called the quick time extension 62 synchronizes the graphics and sounds for display on video display 24 and broadcast over speaker 28. In this way, CPR audible and graphic guidance signals are synchronously output from computer 10. The guidance signals can also be communicated to other devices 64, such as locations over a network or a local storage device for future use. Once created, the sound and image files may be duplicated for distribution and altered to fit both the needs, display means, and culture of any group.

A computer program, features of which will be described later in greater detail, for providing guidance signals to rescue personnel trained in CPR for aiding a victim requiring CPR techniques under emergency conditions is stored in

Copy provided by USPTO from the PIRS Image Database on 04-17-2003

5,913,685

| 5 | 6 |

any of hard disk 18, diskette 20, optical disk 22, or any other computer readable storage medium coupled to CPU 12. The program may also be stored in a remote system (not shown in FIG. 1) coupled to computer 10 via communication interface 36.

Reproduced in the microfiche appendix which constitutes a portion of this specification are portions of an exemplary computer program code according to the invention. The program causes a computer to display visible signals and produce intelligible audible signals representative of proper steps to be taken by rescue personnel in resuscitating an infant or an adult victim in response to information signals furnished by the rescue personnel, wherein the information signals are representative of characteristics of the victim relevant to proper performance of CPR techniques. The program, is written in LINGO, an object oriented language which combine graphics, sound and text for multi-media systems, and is adapted to operate on a Macintosh® 8100 computer. The program incorporates graphic, sound and text files, which can be easily created with commercially available tools, such as, for example, graphic files created with Adobe Photoshop®, by those of ordinary skill in the art. Image and sound files may be stored separately from the program. For example, image files may be stored on an optical disk accessible with optical disk drive 22, while the program is stored on hard disk drive 18 and loaded into RAM 16 when the program is initialized. Program code for causing a similarly configured computer to provide guidance signals for resuscitating a child victim or for performing different resuscitation steps on infant or adult victims can be created in a similar manner by those of skill in the art.

Referring now to FIG. 2, a networked CPR aiding computer system for providing guidance to rescue personnel trained in CPR for resuscitating a victim under emergency conditions includes a network server 100 coupled to an input device 102, such as a keyboard or the like, an output device 104, such as a printer or video monitor or the like, and a storage device 106, such as a disk drive and the like, through which the network server 100 can access information written on a computer readable medium. A CPR aiding computer program, providing the same functions as the CPR aiding program described above with reference to FIG. 1 for multimedia computer system 10, and adapted for use on a computer network is stored in storage device 106. Network server 100 includes a CPU 108 that controls operation of the networked system and that runs the CPR aiding program.

Network server 100 is coupled to peripheral units 110, which each include an input device for entering, during operation of the CPR aiding program, information signals representative at least of characteristics of a victim relevant to proper performance of CPR techniques and an output that has at least a display. Network server 100 is responsive to the information signals and provides output signals representative of proper steps to be taken in resuscitating the victim. The output of the peripheral unit provides guidance signals in response to the output signals, wherein the guidance signals include visible guidance on the display representative of the proper steps to be taken by the rescue personnel in resuscitating the victim.

Network server 100 communicates with the peripheral units via a communication link, which can take a variety of forms. Peripheral units 110 can communicate with network server 100 via modem connections 112 over telephone networks 44, via an interactive CATV system 114 over coaxial cable 116, via a wide area network (WAN) connection 116, for example the internet, over a telephone network

44, via a LAN 48, via a wireless PBX system 118, or the like. Generally, Apple Corp. Macintosh networks use a type of switch called a Router, although such an Apple system could connect through many types of digital switches or through the airwaves with infrared wireless signals.

The peripheral units 110 can be configured with a wide variety of different types of hardware. For example, peripheral units 110 may be configured similarly to multimedia computer system 10, as described above with reference to FIG. 1. They may also be configured as remote terminals, without their own CPU 12. A peripheral unit 110 may be installed in a mobile emergency medical unit (not shown), such as those staffed by emergency medical technicians in many communities, and communicate with a network server 108 located in, for example, a fire station or hospital, via a mobile radio or cellular telephone link. A peripheral unit 110 linked to network server 100 via an interactive CATV system 114 may use an ordinary television as a video monitor and loudspeaker, and an interactive CATV keypad or equivalent device for an input. In exemplary configurations, the peripheral units may include an electroacoustical transducer responsive to the output signals for providing audible guidance of the proper steps to be taken by the rescue personnel in resuscitating the victim and synchronized with the visible guidance. Many other configurations of peripheral units 110 and communication links with network server 100 are possible within the invention.

Apple Corp. Macintosh networks can include a local group of printers and personal computers and can include hundreds of Macs, PC's, printers, and dedicated file, mail, and database servers. Large networks require special network devices such as hubs and routers to control the data running over the cables. Network data can travel over several types of wire cables, as well as over optical cables for high-quality, ultrasecure networks. Radio wave wireless networks may also be used.

The operation of the CPR aiding computer program will now be described in greater detail. The CPR aiding program can be adapted for use on an individual computer system 10 as described above with reference to FIG. 1, and can also be adapted for use on a network server 100 for serving remote and local peripheral units 110. Those of ordinary skill in the art can adapt interactive programs written for individual computers for network use, therefore the features of the CPR aiding program will be described with reference to application for a stand-alone computer system 10 as illustrated in FIG. 1.

In an emergency situation, such as, for example, when a victim is not breathing, choking while conscious, or choking while unconscious, a person previously trained in CPR techniques who is near the victim and a computer terminal, such as multimedia system 10, can initiate the CPR aiding program by, for example, toggling a key on keyboard 32. In a windows type of operating system having a CPR aiding icon displayed on the video display 24, the rescuer may initiate the CPR aiding program by clicking on the icon with mouse 34, touching the icon if the system has a touch screen 36, by pointing to the icon with pointer 38, or the like. Or, in another embodiment, the rescuer can initiate the program by a vocal command to microphone 30, which is communicated to CPU 12 through voice recognition device 40. The remainder of the discussion of the CPR aiding program features will describe entering information by use of the touch screen 36 and keyboard 32, but it will be understood that, depending upon the actual configuration of the computer system 10, the mouse 34, pointer 38 and microphone 30 can also be used for entering information.

5,913,685

7

Upon initiating the CPR aiding program, CPU 12 loads the program into RAM 16, and puts an initial screen 200 on video display 24, as illustrated in FIG. 3. Initial screen 200, and all other screens, are advantageously stored on a computer readable storage medium that can be quickly accessed, such as, for example, an optical disk. Much less RAM 16 is needed in such a configuration, since all screens do not have to be resident in RAM 16 during operation of the CPR aiding program.

Initial screen 200 has a display of a selection keypad 202 for entering information signals representative at least of characteristics of the victim relevant to proper performance of CPR techniques. In one embodiment, the selection keypad 202 is displayed during operation of a screen saver program, and the CPR aiding program can be entered, for example, by touching the "ON" 204 near the top of keypad 202. Touching "OFF" 206 exits the CPR aiding program in either configuration. Initial screen 200 can also include product indicia 208 and a digital time display 210. To the right of keypad 202 is a selection indicator area 212. Near the top of the selection indicator area 212 an on icon 214 indicates that the CPR aiding program is running. The initial screen 200 may advantageously include an area for notes input 216 which, when touched by the rescue personnel, initiates recording a record of the rescue on the computer 10. Text 217 is displayed to urge the rescuer to enter information relating to the age group of the victim, and may also be used to prompt user input regarding the rescue procedure to take place.

The rescuer then enters the victim age group and rescue procedure information by touching appropriate portions of the keypad 202. For example, keypad 202 has areas indicative of three victim age groups, adult 218, child 220 and infant/baby 222, which are labeled on the keypad 202 with letters "A" "B" and "C." Keypad 202 also has areas indicative of procedures for one rescuer CPR 224, two rescuer CPR 226, mouth-to-mouth resuscitation 228, victim choking and conscious 230, and victim choking and unconscious 232, which are labeled "1"–"5," respectively, on the keypad. There is also a pause area 232 at the bottom of keypad 202 for interrupting a sequence of guidance signals. This area is labeled on keypad 202 with the letter "P." Each area also includes a text description and a graphic icon. A keypad that is similar to keypad 202, but that is a physical keypad rather than a video image keypad, is described in Reissue Patent No. RE 34,800, which is incorporated herein by reference.

The CPR aiding program leads the rescuer through a sequence of steps for performing rescue techniques on the victim by providing visible guidance signals on video display 24 and voice guidance signals through speaker 28.

Referring now to FIGS. 4A–4E, a rescuer first inputs the victim age group by touching one of the three age group areas 218, 220, 222. This action sends a signal to CPU 12, which responds with an icon output signal to display 24 that puts an icon of the selected age group, in this case an adult icon 234, in the selection area 212 of screen 235. Once the age group is selected, the CPR aiding program stays with this path and provide the adult icon 234 display on all subsequent screens until a different age group is input, for example, if a mistake had been made in the earlier choice. CPU 12 may also provide an image output signal that puts an animated sequence of graphic images on the display 24 of a rescuer 236 checking a victim's 238 condition (screen 235 in FIG. 4A) and asking for someone to provide assistance (screen 240 in FIG. 4B). CPU 12 may, in conjunction with causing display of the animated images, provide a voice output signal that causes the sound manager 26 to broadcast

8

voice guidance through speaker 28, the voice guidance being synchronized with the graphic images. The graphic images can also include text guidance 242 synchronized with the voice guidance, as illustrated in FIG. 4A. FIG. 4C shows a screen 244 with a telephone image 246, prompting the rescuer 236 to get someone to call for help. Screens 247 and 249 in FIGS. 4D and 4E, respectively, include visible guidance that illustrate the proper technique for turning the victim 238 over to further assess victim condition.

Once the actual victim's condition has been assessed, the rescue personnel touches one of the five keypad rescue procedure areas: one or two person CPR 224, 226, mouth-to-mouth 228, choking conscious 230 and choking unconscious 232. This causes the icon for the selected procedure to be displayed in the selection area 212. The selection also causes the CPR aiding program to initiate the appropriate sequence of synchronized visible and audible guidance for guiding the rescue personnel through proper steps of the selected rescue procedure. The human figures of the display graphics will move with the correct procedures synchronized with the audible guidance.

In FIGS. 4F–4H, screens 248, 250 and 252 show three of a sequence of visible guidance for guiding a rescue person to perform the proper rescue techniques for an unconscious adult choking victim. Each screen 248, 250, 252 displays the adult icon 234 and a choking unconscious icon 254 in selection area 212. Screen 248 in FIG. 4F includes a visual guide 256 for tilting the victim's head back. Screen 250 in FIG. 4G includes a visual guide 258 of a rescuer 236 checking the victim's 238 airway. Screen 252 in FIG. 4H includes a visual guide 260 of proper rescuer hand placement for prompting a further step in the rescue procedure.

FIGS. 4I and 4J illustrate two screens 262, 264 of a sequence of screens including visual guidance for a rescuer to perform the proper rescue techniques on a conscious adult choking victim. Each screen 262, 264 includes a choking conscious icon 266 in selection area. Screen 262 includes a visual guide 268 of a victim 238 choking. Screen 264 includes a visual guide 270 of proper positioning of the rescuer's 236 hands for performing the Heimlich maneuver.

FIGS. 4K shows a screen 270 with a visual guide 272 for assessing the condition of an infant or baby. The infant/baby icon 274 is displayed in the selection area 212.

Screen 276 in FIG. 4L has a visible guide 278 of proper steps for rescuing a choking unconscious baby.

Screen 280 in FIG. 4M includes a visible guide 282 of a proper step in one rescuer CPR being performed on a baby. The one rescuer CPR icon 284 is displayed in the selection area 212. A stopwatch image 285 is displayed to keep rescue personnel aware of the elapsed time since the start of the intervention or from the start of the rescue procedure. It is helpful for a rescuer to know the time since cardiopulmonary resuscitation was started to relay the information to medical personnel.

Screen 286 in FIG. 4N has a visible guide 288 of a proper step in rescuing a choking conscious baby.

Screens 290 and 292 in FIGS. 4O and 4P, respectively, show corresponding visible guides 294 and 296 for mouth-to-mouth resuscitation on a baby. The mouth-to-mouth icon 298 is displayed in the selection area 212.

As mentioned above, the CPR aiding program is preferably configured to record a notes file for providing a record of a sequence of the information signals, the output signals and additional information input by the rescue personnel. This feature will allow a rescuer to integrate information stored by CPU 12 such as, for example, date, start time, number of rescue personnel, victim age group, procedures

Copy provided by USPTO from the PIRS Image Database on 04-17-2003

5,913,685

9

performed, and elapsed time of each procedure, with additional information input from keyboard 32 or through voice recognition 40 system.

For example, when using a computer or terminal during a CPR rescue, a rescuer could hit a key or touch the notes input icon 216 that would open up a file to record input from the computer 10 and rescuer. This input could be keyed in as text, recorded as speech by the computer, or keyed in as graphic symbols. In the same way, any other keystrokes could be recorded and date stamped. The elapsed time could be transferred from the computer memory and recorded together with the date and time of day. Later, other moves, such as changing from "choking unconscious" to "single rescuer CPR" could be recorded and date stamped. As a consequence, the rescuer can automatically furnish a report for medical centers, insurance claims, and the like from this notes file without the stress of reconstructing the information from recall. As an ongoing medical record, a medical center can store this information for future or immediate use. An emergency room can record rescue data automatically during times of chaos and allow this data to become a vital part of the patient medical record, which can be stored or printed out. The rescuer can complete the diary by keying in the victim's name and any unusual circumstance. The rescuers could be named, the paramedics listed, time of death recorded, and the like.

The invention can be implemented in several spoken languages by adding alternate sound and text files in the other languages. The CPR aiding computer program would access a different set sound and text files in a selected alternate spoken language when constructing screens with synchronized voice and image guidance, at no significant loss in speed. Selection of an alternate spoken language may be programmed to be set upon installation of the program or as a user option for each rescue.

Having described specific embodiments of the invention, other embodiments and uses will now become apparent to those skilled in the art without departing from the inventive concepts. Consequently, the invention is to be construed as embracing each and every novel feature and novel combination of features present in or possessed by the apparatus and techniques herein disclosed and limited solely by the spirit and scope of the appended claims.

What is claimed is:

1. A general purpose computer system adapted for cardiopulmonary resuscitation (CPR) aiding to provide guidance to rescue personnel trained in CPR for resuscitating a victim under an emergency condition, comprising:

a computer terminal, including:

an output comprising a display and an electroacoustical transducer; and

an input comprising an interactive display input, wherein the interactive display input is adapted for selecting from image or text viewed on the display that is representative at least of characteristics of said victim relevant to proper performance of CPR techniques, and producing information signals corresponding to the characteristics of said victim represented by said image or text selected with said interactive display input;

a processing unit responsive to the information signals and for providing output signals representative of proper steps to be taken in resuscitating said victim; and

wherein the output, in response to said output signals, provides guidance signals, which include audible speech signals produced by the electroacoustical

10

transducer, of the proper steps to be taken by said rescue personnel in resuscitating said victim.

2. The computer system of claim 1, wherein the guidance signals further include visible signals on the display.

3. The computer system of claim 2, wherein said visible signals include a pictorial representation of a rescue personnel practicing said proper steps upon a victim.

4. The computer system of claim 3, wherein the pictorial representation includes an animated sequence of images.

5. The computer system of claim 3, wherein said said information signals are further representative of the number of said rescue personnel relevant to proper performance of CPR techniques.

6. The computer system of claim 5, wherein the visible display further provides text signals representative of at least one of said relevant characteristics of said victim and said number of said rescue personnel.

7. The computer system of claim 5, wherein said visible display further provides icon representations of at least one of said relevant characteristics of said victim and said number of rescue personnel.

8. The computer system of claim 3, wherein said output signals are further representative of queries regarding at least one of said relevant characteristics of said victim and the number of said rescue personnel relevant to proper performance of CPR techniques.

9. The computer system of claim 3, wherein said input further includes at least one of an alphanumeric keypad for keying the information signals, and a voice recognizer for converting speech information signals into corresponding electrical signals.

10. The computer system of claim 3, wherein said input, said processor unit and said output comprise components of a personal computer.

11. The computer system of claim 10, and further comprising a network of personal computers linked to each other and to said first mentioned personal computer.

12. The computer system of claim 3, and further comprising a recorder for providing a record of a sequence of the information signals and the output signals.

13. A general purpose computer network system adapted to provide guidance to rescue personnel trained in cardiopulmonary resuscitation for resuscitating victims under emergency conditions, comprising:

a plurality of peripheral units, each including an input for entering information signals representative at least of characteristics of a victim relevant to proper performance of CPR techniques, and an output including a display and an electroacoustical transducer, wherein the input comprises an interactive display input adapted for selecting displayed image or text representative at least of characteristics of said victim relevant to proper performance of CPR techniques, and producing information signals corresponding to the characteristics of said victim represented by said image or text selected with said interactive display input;

a network server, including a router, responsive to said information signals for providing output signals representative of proper steps to be taken in resuscitating said victim; and

a communication link for communicating the information signals from the peripheral units to the network server and the output signals from the network server to the peripheral units, wherein said output provides guidance signals in response to said output signals, said guidance signals including audible speech signals representative of the proper steps to be taken by said rescue personnel in resuscitating said victim.

Copy provided by USPTO from the PIRS Image Database on 04-17-2003

5,913,685

**11**

14. The computer network system of claim 13, wherein said guidance signals further include visible guidance signals on the display representative of the proper steps to be taken by said rescue personnel in resuscitating said victim and synchronized with said audible speech signals.

15. The computer network system of claim 14, wherein the visible guidance signals include a pictorial representation of rescue personnel practicing said proper steps upon a victim.

16. The computer network system of claim 15, wherein the pictorial representation includes an animated sequence of images.

17. The computer network system of claim 14, wherein said communication link includes at least one of a wireless communication system and a hard-wired communication system.

18. The computer network system of claim 17, wherein said hard-wired communication system includes a member of the group consisting of a local area network, a PBX network, an interactive CATV network, a telephone network, and the internet.

19. The computer network system of claim 17, wherein said wireless communication system includes a transmitter and a receiver.

20. The computer network system of claim 14, and further including a recorder for providing a record of a sequence of the information signals and the output signals.

21. An article of manufacture, comprising:

a computer usable medium adapted for use in a general purpose computer having a processor, a display, an interactive display input, and an electroacoustical transducer, the computer usable medium having computer readable program code embodied therein for providing guidance signals to rescue personnel trained in CPR for resuscitation of a victim under an emergency condition, including:

computer readable program code for causing the general purpose computer to display image or text on the display corresponding at least to characteristics of said victim relevant to proper performance of CPR techniques;

computer readable program code for causing the general purpose computer to produce information signals based upon image or text selected by rescue personnel with said interactive display input, wherein said information signals are representative of said characteristics corresponding to said selected image or text;

computer readable program code for causing the general purpose computer to provide output signals representative of proper steps to be taken in resuscitating said victim in response to said information signals; and

computer readable program code for causing the general purpose computer to produce audible speech signals representative of proper steps to be taken by said rescue personnel in resuscitating said victim in response to said output signals.

22. The article of manufacture of claim 21, wherein the computer readable program code in the article of manufacture further includes:

computer readable program code for causing the computer, in response to said output signals, to display visible signals on the display synchronized with the audible speech signals, the visible signals representative of proper steps to be taken by said rescue personnel in resuscitating said victim.

**12**

23. The article of manufacture of claim 22, wherein the visible signals include a pictorial representation of rescue personnel practicing said proper steps upon a victim.

24. The article of manufacture of claim 23, wherein the computer readable program code in the article of manufacture further includes:

computer readable program code for causing the computer to display an animated sequence of the pictorial representations.

25. The article of manufacture of claim 24, wherein the computer readable program code in the article of manufacture further includes:

computer readable program code for causing the computer to synchronize the audible speech signals with the animated sequence of pictorial representations.

26. The article of manufacture of claim 24, wherein the visible signals further include icon representations at least of characteristics of said victim relevant to proper performance of CPR techniques.

27. The article of manufacture of claim 24, wherein the visible signals further include text representations at least of characteristics of said victim relevant to proper performance of CPR techniques.

28. The article of manufacture of claim 24, wherein the computer readable program code in the article of manufacture further includes:

computer readable program code for causing the computer to store a record of a sequence of the information signals and the output signals.

29. The article of manufacture of claim 24, wherein said information signal is further representative of the number of said rescue personnel.

30. The article of manufacture of claim 24, wherein said information signal includes a language selection signal and the computer readable program code in the article of manufacture further includes computer readable program code for causing the computer to produce the audible speech signals in a spoken language selected from a group of spoken languages in response to said language selection signal.

31. A computer program for providing guidance signals to rescue personnel trained in CPR for resuscitating a victim under an emergency condition, the computer program being stored on a media readable by a general purpose computer, for configuring the computer being read and executed by the computer to perform functions comprising:

displaying image or text on the display corresponding at least to characteristics of said victim relevant to proper performance of CPR techniques;

producing information signals based upon image or text selected by rescue personnel with said interactive display input, wherein said information signals are representative of said characteristics corresponding to said selected image or text;

providing output signals representative of proper steps to be taken in resuscitating said victim in response to said information signals; and

providing guidance signals representative of proper steps to be taken by said rescue personnel in resuscitating said victim in response to said information signal, said guidance signals comprising audible speech signals.

32. The computer program of claim 31, wherein said guidance signals further comprise visible signals on a display representative of said proper steps to be taken by said rescue personnel in resuscitating said victim in response to said information signal.

33. The computer program of claim 32, wherein said functions further comprise synchronizing the audible speech signals with the visible signals.

Copy provided by USPTO from the PIRS Image Database on 04-17-2003

5,913,685

13

**34.** The computer program of claim **32,** wherein the visible signals include a pictorial representation of rescue personnel practicing said proper steps upon a victim.

**35.** The computer program of claim **34,** wherein said functions further comprise animating said pictorial representation.

**36.** The computer program of claim **32,** wherein said functions further comprise causing the computer to store a record of a sequence of the information signals and the output signals.

**37.** The computer program of claim **32,** wherein the information signal is further representative of the number of rescue personnel.

**38.** The computer program of claim **32,** wherein said functions further comprise:

receiving a language selection signal indicative of a spoken language selected from a plurality of spoken languages; and

causing the computer to produce the audible speech signals in the selected spoken language in response to the language selection signal.

**39.** A method for use in cardiopulmonary resuscitation with a general purpose computer system configured for providing guidance to rescue personnel trained in cardiopulmonary resuscitation (CPR) for resuscitating a victim under an emergency condition, the computer system comprising a computer terminal having an input and an output, a processing unit responsive to the processor and including a display and an electroacoustical transducer, the input including an interactive display input, the method including:

displaying image or text on the display corresponding at least to characteristics of said victim relevant to proper performance of CPR techniques;

producing information signals based upon image or text selected by rescue personnel with said interactive display input, wherein said information signals are representative of characteristics corresponding to said selected image or text;

14

sentative of characteristics corresponding to said selected image or text;

processing said information signals, including providing output signals representative of proper steps to be taken in resuscitating said victim;

converting said output signals into signals corresponding to speech signals representative of the proper steps to be taken by said rescue personnel in resuscitating said victim; and

applying said signals corresponding to speech signals to the electroacoustical transducer to provide audible speech guidance signals representative of the proper steps to be taken by said rescue personnel in resuscitating said victim.

**40.** The method of claim **39,** wherein said computer terminal further comprises an electroacoustical transducer responsive to said output signals, and wherein said method further comprises converting said output signals to signals corresponding to visible signals representative of the proper steps to be taken by said rescue personnel in resuscitating said victim, and applying said signals corresponding to visible signals to said display to provide visible guidance signals representative of the proper steps to be taken by said rescue personnel in resuscitating said victim synchronized with said audible speech guidance signals.

**41.** The method of claim **40,** wherein said visible guidance signals include an animated sequence of images of a rescue personnel practicing said proper steps upon a victim.

**42.** The method of claim **40,** wherein said input, processor and output of said computer system comprise a personal computer in a network of computers, including a router, linked to each other.

**43.** The method of claim **40,** wherein said method further includes storing a record of said information signals on a storage medium.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 04-17-2003

# EXHIBIT B

US 20040176807A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: **US 2004/0176807 A1**
　　Freeman (43) Pub. Date: **Sep. 9, 2004**

(54)　INTEGRATED RESUSCITATION

(75)　Inventor:　**Gary A. Freeman**, Newton Centre, MA (US)

　　Correspondence Address:
　　FISH & RICHARDSON PC
　　225 FRANKLIN ST
　　BOSTON, MA 02110 (US)

(73)　Assignee:　**ZMD Corporation**, a Delaware corporation

(21)　Appl. No.:　**10/804,312**

(22)　Filed:　**Mar. 18, 2004**

**Related U.S. Application Data**

(63)　Continuation of application No. 09/794,320, filed on Feb. 27, 2001, now abandoned, which is a continuation-in-part of application No. 09/498,306, filed on Feb. 4, 2000, now abandoned, and which is a continuation of application No. PCT/US01/03781, filed on Feb. 5, 2001.

**Publication Classification**

(51)　Int. Cl.[7] ................................................. A61N 1/39

(52)　U.S. Cl. .................................................. 607/5

(57)　　　　　　　**ABSTRACT**

A resuscitation system that includes at least two defibrillation electrodes configured to be applied to the exterior of the chest of a patient for delivering a defibrillation shock, a source of one or more ECG signals from the patient, a defibrillation circuit for delivering a defibrillation shock to the defibrillation electrodes, a control box that receives and processes the ECG signals to determine whether a defibrillation shock should be delivered or whether CPR should be performed, and that issues instructions to the user either to deliver a defibrillation shock or to perform CPR, wherein the determination of whether CPR should be performed and the instructions to perform CPR can occur at substantially any point during a rescue. The control box may include a user operable control for initiating delivery of a defibrillation shock, and the instructions to deliver a defibrillation shock include instructions to activate the user operable control. The user operable control may be a button configured to be pushed by the user. The determination of whether CPR should be performed and the instructions to perform CPR may occur before a determination to deliver any defibrillation shock. The source of the ECG signals may be the defibrillation electrodes. The defibrillation circuit may be contained in the control box.



ZOLL  0296



FIG. 1

ZOLL 0297



FIG. 2



FIG. 3

FIG. 4

Patent Application Publication     Sep. 9, 2004   Sheet 4 of 12        US 2004/0176807 A1



FIG. 5



FIG. 6A

ZOLL 0301



FIG. 6B

ZOLL 0302



# FIG. 7A

ZOLL  0303



FIG. 7B

ZOLL  0304



FIG. 7C



FIG. 8



FIG. 9A

ZOLL  0307



# FIG. 9B

ZOLL  0308

US 2004/0176807 A1

Sep. 9, 2004

1

# INTEGRATED RESUSCITATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001] This application is a continuation of and claims priority to U.S. application Ser. No. 09/794,320, filed on Feb. 27, 2001, which is a continuation-in-part of and claims priority to U.S. application Ser. No. 09/498,306, filed on Feb. 4, 2000, and PCT Application Serial No. PCT/US01/03781, filed on Feb. 5, 2001.

## BACKGROUND OF THE INVENTION

[0002] This invention relates to integrated resuscitation systems incorporating defibrillation and cardio-pulmonary resuscitation (CPR) prompts.

[0003] Resuscitation can generally include clearing a patient's airway, assisting the patient's breathing, chest compressions, and defibrillation.

[0004] The American Heart Association's Basic Life Support for Health Care Providers textbook provides a flow chart at page 4-14 of Chapter 4 that lists the steps of airway clearing, breathing, and circulation (known as A, B, and C), for situations in which there is no defibrillator readily accessible to the rescuer.

[0005] Defibrillation (sometimes known as step D) can be performed with the use of an automatic external defibrillator (AED). Most automatic external defibrillators are actually semi-automatic external defibrillators (SAED), which require a clinician to press a start button, after which the defibrillator analyzes the patient's condition and provides a shock to the patient if the electrical rhythm is shockable and waits for user intervention before any subsequent shock. Fully automatic external defibrillators, on the other hand, do not wait for user intervention before applying subsequent shocks. As used below, automatic external defibrillators (AED) include semi-automatic external defibrillators (SAED).

[0006] Both types of defibrillators typically provide an oral stand clear warning before the application of each shock, and then the clinician is expected to stand clear of the patient and may be required to press a button indicating that the clinician is standing clear of the patient. The controls for automatic external defibrillators are typically located on a resuscitation control box.

[0007] AEDs are used typically by trained providers such as physicians, nurses, fire department personnel, and police officers. There might be one or two people at a given facility that has an AED who have been designated for defibrillation resuscitation before an ambulance service arrives. The availability of on-site AEDs along with rescuers trained to operate them is important because if the patient experiences a delay of more than 4 minutes before receiving a defibrillation shock the patient's chance of survival can drop dramatically. Many large cities and rural areas have low survival rates for defibrillation because the ambulance response time is slow, although many suburbs have higher survival rates because of the faster ambulance response time due to lack of traffic and availability of hospitals and advanced life support.

[0008] Trained lay providers are a new group of AED operators, but they rarely have opportunities to defibrillate.

For example, spouses of heart attack victims may become lay providers, but these lay providers can be easily intimidated by an AED during a medical emergency. Consequently, such lay providers can be reluctant to purchase AEDs, or might tend to wait for an ambulance to arrive rather than use an available AED, out of concern that the lay provider might do something wrong.

[0009] There are many different kinds of heart rhythms, some of which are considered shockable and some of them are not. For example, a normal rhythm is considered non-shockable, and there are also many abnormal non-shockable rhythms. There are also some abnormal non-viable non-shockable, which means that the patient cannot remain alive with the rhythm, but yet applying shocks will not help convert the rhythm.

[0010] As an example of a non-shockable rhythm, if a patient experiences asystole, the heart will not be beating and application of shocks will be ineffective. Pacing is recommended for asystole, and there are other things that an advanced life support team can do to assist such patient, such as the use of drugs. The job of the first responder is simply to keep the patient alive, through the use of CPR and possibly defibrillation, until an advanced life support team arrives. Bradycardias, during which the heart beats too slowly, are non-shockable and also possibly non-viable. If the patient is unconscious during bradycardia, it can be helpful to perform chest compressions until pacing becomes available. Electro-mechanical dissociation (EMD), in which there is electrical activity in the heart but it is not making the heart muscle contract, is non-shockable and non-viable, and would require CPR as a first response. Idio-ventricular rhythms, in which the normal electrical activity occurs in the ventricles but not the atria, can also be non-shockable and non-viable (usually, abnormal electrical patterns begin in the atria). Idio-ventricular rhythms typically result in slow heart rhythms of 30 or 40 beats per minute, often causing the patient to lose consciousness. The slow heart rhythm occurs because the ventricles ordinarily respond to the activity of the atria, but when the atria stop their electrical activity, a slower, backup rhythm occurs in the ventricles.

[0011] The primary examples of shockable rhythms, for which a first responder should perform defibrillation, include ventricular fibrillation, ventricular tachycardia, and ventricular flutter.

[0012] After using a defibrillator to apply one or more shocks to a patient who has a shockable electrical rhythm, the patient may nevertheless remain unconscious, in a shockable or non-shockable rhythm. The rescuer may then resort to chest compressions. As long as the patient remains unconscious, the rescuer can alternate between use of the defibrillator (for analyzing the electrical rhythm and possibly applying a shock) and performing cardio-pulmonary resuscitation (CPR).

[0013] CPR generally involves a repeating pattern of five or fifteen chest compressions followed by a pause. CPR is generally ineffective against abnormal rhythms, but it does keep some level of blood flow going to the patient's vital organs until an advanced life support team arrives. It is difficult to perform CPR over an extended period of time. Certain studies have shown that over a course of minutes, rescuers tend to perform chest compressions with less-than-sufficient strength to cause an adequate supply of blood to

ZOLL 0309

2

flow to the brain. CPR prompting devices can assist a rescuer by prompting each chest compression and breath.

[0014] PCT Patent Publication No. WO 99/24114, filed by Heartstream, Inc., discloses an external defibrillator having PCR and ACLS (advanced cardiac life support) prompts.

SUMMARY OF THE INVENTION

[0015] One aspect of the invention features a resuscitation system that includes at least one first high-voltage defibrillation electrode, at least one second high-voltage defibrillation electrode, at least one manually operable control mechanically connected with and in the vicinity of at least one of the first and second electrodes; and a resuscitation control system electrically connected to the first and second electrodes and the at least one manually operable control and configured to provide resuscitation prompts to a rescuer based on use of the manually operable control by the rescuer.

[0016] In preferred implementations, one or more of the following features may be incorporated. There may be a plurality of manually operable controls mechanically connected with at least one of the first and second electrodes. The at least one manually operable control may include a pause control for pausing a resuscitation procedure. The at least one manually operable control may include a help button for requesting prompts from the resuscitation control system with respect to a particular aspect of resuscitation (e.g., clearing a patient's airway, assisting a patient's breathing, assisting a patient's circulation). The first electrode may be a sternum electrode and the second electrode may be an apex electrode. The manually operable control may be a button configured to be pushed by the user.

[0017] A second aspect of the invention features a CPR system that includes a CPR pad configured to be located over a region of a patient's body appropriate for CPR chest compressions, a compression-sensing element interconnected with the CPR pad, a resuscitation control system electrically connected to the compression-sensing element and configured to receive compression information from the compression-sensing element; and at least one manually operable control mechanically connected with the CPR pad, wherein the resuscitation control system is electrically connected to the at least one manually operable control and is configured to provide resuscitation prompts to a rescuer based on use of the manually operable control by the rescuer.

[0018] A third aspect of the invention features a resuscitation system that includes at least two defibrillation electrodes configured to be applied to the exterior of the chest of a patient for delivering a defibrillation shock, a source of one or more ECG signals from the patient, a defibrillation circuit for delivering a defibrillation shock to the defibrillation electrodes, a control box that receives and processes the ECG signals to determine whether a defibrillation shock should be delivered or whether CPR should be performed, and that issues instructions to the user either to deliver a defibrillation shock or to perform CPR, wherein the determination of whether CPR should be performed and the instructions to perform CPR can occur at substantially any point during a rescue.

[0019] In preferred implementations, one or more of the following features may be incorporated. The control box may include a user operable control for initiating delivery of a defibrillation shock, and the instructions to deliver a defibrillation shock include instructions to activate the user operable control. The user operable control may be a button configured to be pushed by the user. The determination of whether CPR should be performed and the instructions to perform CPR may occur before a determination to deliver any defibrillation shock. The source of the ECG signals may be the defibrillation electrodes. The defibrillation circuit may be contained in the control box.

[0020] Numerous other features and advantages of the invention will be apparent from the detailed description and the drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

[0021] FIG. 1 is a drawing of a defibrillation electrode pad according to the invention, positioned over the chest of a patient.

[0022] FIG. 2 is a view of the front display panel of a resuscitation control box according to the invention that houses electronic circuitry and provides audible and visual prompting.

[0023] FIG. 3 is a cross-sectional drawing of the defibrillation electrode pad of FIG. 1 taken along line 3-3.

[0024] FIG. 4 is a cross-sectional drawing of the defibrillation pad of FIG. 1 taken along line 4-4.

[0025] FIG. 5 is a circuit diagram illustrating the circuit interconnections between the defibrillation electrode pad of FIG. 1 and the resuscitation control box of FIG. 2.

[0026] FIGS. 6A and 6B are a flowchart illustrating the initial routine of a resuscitation system according to the invention.

[0027] FIGS. 7A, 7B, and 7C are a flowchart illustrating the "circulation help" routine of the resuscitation system.

[0028] FIG. 8 is a flowchart illustrating the "breathing help" routine of the resuscitation system.

[0029] FIGS. 9A and 9B are a flowchart illustrating the "airway help" routine of the resuscitation system.

DETAILED DESCRIPTION

[0030] The defibrillation and CPR assembly according to the invention combines traditional AED (automatic external defibrillation) functions with CPR prompting, and thus transforms a defibrillator into a resuscitation device that combines prompts for clearing a patient's airway, breathing, chest compression, and defibrillation. Thus, the combined defibrillation and CPR assembly combines all of these aspects of resuscitation into a single protocol.

[0031] With reference to FIG. 1, a defibrillation electrode pad 10, which includes high-voltage apex defibrillation electrode 12 and high-voltage sternum defibrillation electrode 14, is placed on the patient's chest 16 and includes a region 18 on which a user may press to perform CPR. Legends on pad 10 indicate proper placement of the pad with respect to the patient's collarbones and the chest centerline and the proper placement of the heel of the rescuer's hand.

[0032] A low-profile button panel 20 is provided on the electrode assembly. Button panel 20 has buttons 22, including buttons A (Airway Help), B (Breathing Help), C (Cir-

ZOLL 0310

culation Help) and PAUSE, and may also include adjacent light emitting diodes (LEDs) 24 that indicate which button has been most recently pressed. Button panel 20 is connected by a cable 23 to a remote resuscitation control box 26, shown in FIG. 2. Button panel 20 provides rigid support underneath buttons A, B, C, and PAUSE against which the switches can be pushed in order to ensure good switch closure while the electrode rests on a patient. Button panel 20 includes components that make electrical contact with silver/silver-chloride electrical circuit components screen-printed on a polyester base of defibrillation electrode pad 10, as is described in detail below.

[0033] A pulse detection system based on shining light through the patient's vascular bed, e.g., a pulse oximetry system 52, is incorporated into defibrillation electrode pad 10. Pulse oximetry system 52 includes a red light-emitting diode, a near-infrared light-emitting diode, and a photodetector diode (see FIG. 3) incorporated into defibrillation electrode pad 10 in a manner so as to contact the surface of the patient's chest 16. The red and near-infrared light-emitting diodes emit light at two different wavelengths, which is diffusely scattered through the patient's tissue and detected by the photodetector diode. The information obtained from the photodetector diode can be used to determine whether the patient's blood is oxygenated, according to known noninvasive optical monitoring techniques.

[0034] In an alternative embodiment, the pulse detection system is a phonocardiogram system for listening to the sound of the victim's heart, rather than a pulse oximetry system. The phonocardiogram system includes a microphone and an amplifier incorporated within the electrode pad. Because a heart sound can be confused with microphone noise, the signal processing that must be performed by the microprocessor inside the control box will be more difficult in connection with a phonocardiogram system than in connection with a pulse oximetry system. Nevertheless, there are programs available that can enable the microprocessor to determine whether an ECG signal is present as opposed to microphone noise.

[0035] Pulse oximetry is a well-developed, established technology, but it requires good contact between the light sources and the victim's skin so that light can shine down into the victim's vascular bed. Many victims have lots of chest hair, which can interfere with good contact. It may be desirable for different types of electrode pads to be available at a given location (one having a pulse oximetry system and one having a phonocardiogram system) so that a rescuer can select an appropriate electrode pad depending on the nature of the victim.

[0036] In an alternative embodiment, instead of providing a low-profile button panel, a button housing can be provided that is affixed to an edge of the defibrillation electrode. The housing may be in the form of a clamshell formed of single molded plastic element having a hinge at an edge of the clamshell around which the plastic bends. The two halves of the clamshell can be snapped together around the electrode assembly.

[0037] The resuscitation control box (FIG. 2) includes an internal charge storage capacitor and associated circuitry including a microprocessor, an further includes off/on dial 28, and a "READY" button 30 that the rescuer presses

immediately prior to application of a defibrillation shock in order to ensure that the rescuer is not in physical contact with the patient. The microprocessor may be a RISC processor such as a Hitachi SH-3, which can interface well with displays and keyboards, or more generally a processor capable of handling DSP-type (digital signal processing) operations.

[0038] The resuscitation control box has printed instructions 32 on its front face listing the basic steps A, B, and C for resuscitating a patient and giving basic instructions for positioning the defibrillation electrode pad on the patient. A speaker 32 orally prompts the user to perform various steps, as is described in detail below.

[0039] For example, the resuscitation control box instructs the user, by audible instructions and also through a display 34 on the resuscitation control box, to check the patient's airway and perform mouth-to-mouth resuscitation, and if the patient's airway is still blocked, to press the A (Airway Help) button on the button panel (FIG. 1), upon which the resuscitation control box gives detailed prompts for clearing the patient's airway. If the patient's airway is clear and the patient has a pulse but the patient does not breathe after initial mouth-to-mouth resuscitation, the resuscitation control box instructs the user press the B (Breathing Help) button, upon which the resuscitation control box gives detailed mouth-to-mouth resuscitation prompts. If, during the detailed mouth-to-mouth resuscitation procedure, the rescuer checks the patient's pulse and discovers that the patient has no pulse, the resuscitation control box instructs the user to press the C (Circulation Help) button.

[0040] During the circulation procedure, the resuscitation control box receives electrical signals from the defibrillation electrodes and determines whether defibrillation or CPR should be performed. If the resuscitation control box determines that defibrillation is desirable, the resuscitation control box instructs the user to press the "ready" button on the resuscitation control box and to stand clear of the patient. After a short pause, the resuscitation control box causes a defibrillation pulse to be applied between the electrodes. If at any point the resuscitation control box determines, based on the electrical signals received from the electrodes, that CPR is desirable, it will instruct the user to perform CPR.

[0041] Thus, the key controls for the system are on the electrodes attached to the patient rather than the resuscitation control box. This is important because it enables the rescuer to remain focused on the patient rather than the control box. The resuscitation control box gets its information directly from the electrodes and the controls on the electrodes.

[0042] The resuscitation control box can sense electrical signals from the patient's body during pauses between CPR compressions. Also, as is described below, a compression-sensing element such as an accelerometer or a force-sensing element is provided in the region of the defibrillation electrode pad on which the user presses to perform CPR. The purpose of the compression-sensing or force-sensing element is to allow the resuscitation control box to prompt the user to apply additional compression or force, or to prompt the user to cease CPR if the user is performing CPR at an inappropriate point in time.

[0043] Referring to FIG. 4, according to one embodiment of the invention, each electrode 12, 14 (only electrode 12 is

ZOLL 0311

4

shown) of defibrillation electrode pad 10 includes a polymer-based ink containing a silver/silver-chloride suspension, which is screen-printed on a polyester or plastic base 36. The ink is used to carry the defibrillation current. The screen-printing process first involves applying a resist layer to the polyester base 36. The resist layer is basically a loose mesh of nylon or the like, in which the holes have been filled in at some locations in the mesh. Then, the silver/silver-chloride ink is applied as a paste through the resist layer in a squeegee-like manner. The ink squeezes through the screen and becomes a solid layer. The ink may then be cured or dried. The silver/silver-chloride ink provides good conductivity and good monitoring capabilities.

[0044]  Thus, the ink can be applied as pattern, as opposed to a solid sheet covering the entire polyester base. For example, U.S. Pat. No. 5,330,526 describes an electrode in which the conductive portion has a scalloped or daisy shape that increases the circumference of the conductive portion and reduces burning of the patient. A conductive adhesive gel 38 covers the exposed surface of each electrode.

[0045]  In addition, electrical circuit components are also be screen printed on the base, in the same manner as flat circuit components of membrane-covered, laminated panel controls.

[0046]  Referring to FIG. 3, a rigid piece 40 of hard plastic, such as PVC or polycarbonate, is laminated beneath substrate 36 and supports buttons A, B, C, and PAUSE. The rigid plastic piece 40 is glued onto substrate 36. Buttons A, B, C, and PAUSE consist of small metal dome snap-action switches that make contact between an upper conductive ink trace 42 and lower conductive ink traces 44, 46, 48, and 50. Buttons A, B, C, and PAUSE serve as controls that can be activated by the user that are physically located either on or immediately adjacent to the electrode assembly itself.

[0047]  Each of buttons A, B, C, and PAUSE may be associated with an adjacent light-emitting diode (LED). For example, LEDs may be glued, using conductive epoxy, onto silver/silver-chloride traces on substrate 36. An embossed polyester laminate layer 54 covers conductive ink trace 42 of buttons A, B, C, and PAUSE, and a foam layer 56 is laminated beneath rigid plastic piece 40.

[0048]  Referring again to FIG. 4, defibrillation electrode pad 10 includes an extension piece that is placed directly over the location on the patient's body where the rescuer performs chest compressions. This extension piece includes substrate 36, and a semi-rigid plastic supporting member 58 laminated underneath substrate 36 that covers the chest compression area. Semi-rigid supporting member 58 provides somewhat less rigidity than rigid plastic piece 409 provided at the location of buttons A, B, C, and PAUSE (illustrated in FIG. 3).

[0049]  In embodiments having a force-sensing element, a polyester laminate 60, and a force-sensing resistor having two layers of carbon-plated material 62 and 64, are laminated between polyester substrate 36 and semi-rigid supporting member 58. A suitable construction of the force-sensing resistor is illustrated in the FSR Integration Guide & Evaluation Parts Catalog with Suggested Electrical Interfaces, from Interlink Electronics. The electrical contact between the two carbon-plated layers of material increases with increased pressure, and the layers of force-sensing

resistive material can provide a generally linear relationship between resistance and force. Conductive ink traces 66 and 68 provide electrical connections to the two layers of the force-sensing resistor.

[0050]  During chest compressions, the rescuer's hands are placed over the extension piece, and the force-sensing resistor of the extension piece is used to sense the force and the timing of the chest compressions. The force-sensing resistor provides information to the resuscitation control box so that the resuscitation control box can provide the rescuer with feedback if the rescuer is applying insufficient force. The resuscitation control box also provides coaching as to the rate at which CPR is performed. In certain situations, the resuscitation control box indicates to the rescuer that CPR should be halted because it is being performed at an inappropriate time, such as immediately prior to application of a defibrillation shock when the rescuer's hands should not be touching the patient, in which case the resuscitation control box will also indicate that the rescuer should stay clear of the patient because the patient is going to experience a defibrillation shock.

[0051]  As is noted above, during CPR the rescuer pushes on the patient's chest through the extension piece in the vicinity of the electrodes. If the resuscitation control box were to perform analysis during the chest compressions, the chest compressions would be likely to affect the sensed electrical rhythm. Instead, during the pauses between sets of compressions (for example, the pause after every fifth chest compression), the resuscitation control box can perform an electrocardiogram (ECG) analysis. The resuscitation control box might discover, for example, that the patient who is undergoing CPR is experiencing a non-shockable rhythm such as bradycardia, in which case the CPR is required in order to keep the patient alive, but then the resuscitation control box may discover that the rhythm has changed to ventricular fibrillation in the midst of CPR, in which case the resuscitation control box would instruct the rescuer to stop performing CPR so as to allow the resuscitation control box to perform more analysis and possibly apply one or more shocks to the patient. Thus, the invention integrates the rescuer into a sophisticated scheme that allows complex combinations of therapy.

[0052]  In an alternative embodiment, a compression-sensing element such as an accelerometer may be used in place of a force-sensing element. The accelerometer, such as a solid-state ADXL202 accelerometer, is positioned at the location where the rescuer performs chest compressions. In this embodiment, the microprocessor obtains acceleration readings from the accelerometer at fixed time intervals such as one-millisecond intervals, and the microprocessor integrates the acceleration readings to provide a measurement of chest compression. The use of an accelerometer is based on the discovery that it is more important to measure how deeply the rescuer is compressing the chest than to measure how hard the rescuer is pressing. In fact, every victim's chest will have a different compliance, and it is important that the chest be compressed about an inch and a half to two inches in a normal sized adult regardless of the victim's chest compliance.

[0053]  FIG. 5 is a circuit diagram illustrating the circuit interconnections between the defibrillation electrode pad of FIG. 1 through the cable to the resuscitation control box of

ZOLL  0312

5

FIG. 2. Sternum electrode 14 is connected to HV+ at the resuscitation control box, and apex electrode 12 is connected to HV–. A ground GND is connected to the upper conductive ink trace of buttons A, B, C, and PAUSE and to one of the layers of the force-sensing resistor. The other layer of the force-sensing resistor is connected to CPR_FORCE, and the lower conductive ink traces associated with buttons A, B, C, and PAUSE are connected to BUTTON_DETECT through resistors R1, R2, R3, and R4. As an alternative to the use of a force-sensing resistor, a compression-sensing accelerometer 76 may be employed, in which case CPR_FORCE is replaced by CPR_ACCEL connected to accelerometer 76. Red light-emitting diode 70, near-infrared light-emitting diode 72, and photodetector diode 74 of the pulse oximetry system are connected to RLED, ILED, and ISENSE respectively, as well as ground AGND. As an alternative to the use of a pulse oximetry system, a phonocardiogram system may be employed, in which case RLED, ILED, and ISENSE is replaced by SENSE connected to microphone 78 and amplifier 80.

[0054] FIGS. 6-9 illustrate the routine of the resuscitation system described above, which is based on steps A, B, and C (airway, breathing, and circulation). Because step C includes defibrillation as well as chest compressions, all of the aspects of resuscitation are tied together in one protocol (actually, if defibrillation were considered to be a step D distinct from step C, the sequence of steps would be A, B, D, C).

[0055] The first thing the rescuer must do upon arriving at the patient is to determine whether the patient is unconscious and breathing. The rescuer opens the patient's airway, administers breaths to the patient if the patient is not breathing, and checks to determine whether a pulse is present. If there is no pulse, rather than perform chest compressions as in standard CPR, the rescuer allows the resuscitation control box to analyze the patient's electrical rhythm, and if the resuscitation control box determines that the rhythm is shockable, the resuscitation control box causes one or more shocks to be applied to the patient, and then the rescuer performs chest compressions. Thus, the invention provides a first response system that can keep the patient viable until an advanced life support time arrives to perform advanced techniques including pacing, further defibrillation, and drug therapy.

[0056] If the resuscitation control box determines that it should apply one or more defibrillation shocks to the patient, it is important that the rescuer not be anywhere near the patient when the shocks are applied to the patient. Prior to application of each shock, the resuscitation control box instructs the rescuer to please press the "ready" button when everybody is clear of the patient. The pressing of the "ready" button verifies that the rescuer's hands are off the patient.

[0057] When the resuscitation control box detects a shockable rhythm, the resuscitation control box provides a sequence of shocks of appropriate duration and energy (such as a sequence of shocks of increasing energy from 200 Joules to 300 Joules to the highest setting, 360 Joules, with the resuscitation control box performing analysis after each shock to determine whether another shock is required). If the defibrillation therapy is successful, the patient's rhythm is typically converted from ventricular fibrillation, ventricular tachycardia, or ventricular flutter to bradycardia, idio-ventricular rhythm,

or asystole, all of which require CPR. It is rare to convert to a normal rhythm. Once the resuscitation control box has caused defibrillation shocks to be applied to the patient, the resuscitation control box automatically senses the patient's condition, and depending on the patient's condition will either prompt the responder to perform CPR or will not prompt the respond to perform CPR.

[0058] Defibrillation equipment can be somewhat intimidating to rescuers who are not medical professionals because the equipment can lead the rescuer to feel responsibility for having to save a loved one's life. It is important that the defibrillation equipment reduce this sense of responsibility. In particular, when the rescuer presses the "ready" button, rather than apply a shock immediately that will cause the patient's body to jump dramatically, the resuscitation control box will thank the rescuer and instruct the rescuer to remain clear of the patient and then wait for about two seconds (the resuscitation control box may describe this period to the rescuer as being an internal safety check, even if no substantial safety check is being performed). This process has an effect similar to a conversation that hands responsibility to the resuscitation control box, which makes the decision whether to apply the shock. Thus, the system maintains the rescuer safety features of a semi-automatic external defibrillator, because the rescuer must press the "ready" button before each shock, while appearing to operate more as a fully automatic external defibrillator because the time delay immediately prior to each shock leaves the rescuer with the impression that operation of the equipment is out of the hands of the rescuer. The use of CPR prompts in combination with the defibrillation also adds to the sense that the rescuer is simply following instructions from the resuscitation control box.

[0059] With reference to FIGS. 6-9, when the rescuer turns the resuscitation control box on (step 101), the resuscitation control box first informs the rescuer that the rescuer can temporarily halt prompting by pressing the PAUSE button (step 102), and then, after a pause, instructs the rescuer to check responsiveness of patient, and if the patient is non-responsive to call an emergency medical service (EMS) (steps 103, 104). The resuscitation control box then instructs the rescuer to check the patient's airway to determine whether the patient is breathing (steps 105-107).

[0060] After a pause, the resuscitation control box then instructs the rescuer that if the patient is breathing the patient should be placed on the patient's side, unless trauma is suspected, and that the rescuer should press the PAUSE button (steps 108-109). Then the resuscitation control box instructs the rescuer to perform mouth-to-mouth resuscitation if the patient is not breathing (steps 110-114). Then the resuscitation control box instructs the rescuer to press an Airway Help button A if the patient's airway is blocked, so that the resuscitation control box can give prompts for clearing obstructed airways (steps 115 of FIG. 6B and 147-158 of FIGS. 9A-9B).

[0061] Next, after a pause (step 116a), if the resuscitation control box does not include pulse oximetry or phonocardiogram capability (step 116b), the resuscitation control box instructs the rescuer to check the patient's pulse (step 117). After another pause, the resuscitation control box instructs the rescuer to press a Breathing Help button B if the patient's pulse is okay but the patient is not breathing, so that the

ZOLL 0313

6

resuscitation control box can give prompts for assisting the patient's breathing (steps 118 and 119 of FIGS. 7A and 140-146 of FIG. 8). Light-emitting diodes adjacent the various buttons indicate which button has been pressed most recently (only one light remains on at a time). The resuscitation control box next prompts the rescuer to contact an emergency medical system (step 120) and to open the patient's shirt or blouse and attach the adhesive pads (steps 122f-122h).

[0062] If the resuscitation control box does include pulse oximetry or phonocardiogram capability (step and 116b), the resuscitation control box prompts the rescuer to open the patient's shirt or blouse and attach the adhesive pads (steps 121 and 122a). If the pulse oximetry or phonocardiogram system does not provide a valid pulsatile reading (step 122b), then the flow chart proceeds to step 117. If the pulse oximetry or phonocardiogram system does provide a valid pulsatile reading and detects a pulse (steps 122b and 122c), then the resuscitation control box begins the breathing help routine (steps 122d of FIG. 7B and step 140 of FIG. 8). If the pulse oximetry or phonocardiogram system does not detect a pulse, then the resuscitation control prompts the rescuer to contact an emergency medical system (step 122e), measures the impedance of the patient to determine whether it is within an acceptable range for application of shocks (step 123) and determines whether the patient's rhythm is shockable (steps 124). If the rhythm is shockable, the resuscitation control box causes a sequence of shocks to be applied to the patient, each shock requiring the rescuer first to press the "READY" button on the resuscitation control box (steps 124-131). After the last shock in the sequence, or if the rhythm is non-shockable, the resuscitation control box prompts the rescuer in CPR (steps 132-139). The flowchart then returns to step 117.

[0063] FIG. 8 shows the steps 140-146 for prompting the rescuer to assist the patient's breathing. After 12 breaths have been completed (step 144), the pulse oximetry or phonocardiogram system attempts to detect a pulse (step 145a), or, if the system does not include a pulse oximetry or phonocardiogram system, the resuscitation control box prompts the rescuer to check the patient's pulse. If no pulse is present, the resuscitation control box prompts the rescuer to press a Circulation Help button C (step 145b) that brings the rescuer back to the circulation portion of the flowchart. Otherwise, if a pulse is detected, then the flow chart of FIG. 8 returns to step 142.

[0064] The combined defibrillation and CPR resuscitation assembly provided by the invention can be less intimidating than conventional AEDs because the assembly is not devoted solely to defibrillation. Moreover, the resuscitation assembly is less intimidating because it accommodates common skill retention problems with respect to necessary techniques ancillary to defibrillation such as mouth-to-mouth resuscitation and CPR, including the appropriate rates of chest compression, the proper location for performing compressions, the proper manner of tilting the patient's head. In addition, because the rescuer knows that it may never even be necessary to apply a defibrillation shock during use of the resuscitation assembly, the rescuer may be more comfortable using the resuscitation assembly for mouth-to-mouth resuscitation and CPR. Unlike previous CPR prompting devices, the rescuer would be required to place the electrode assembly on top of the patient, but the

rescuer would do this with the belief that the resuscitation assembly will be sensing the patient's condition and that the likelihood that the resuscitation assembly is actually going to apply a shock is low. If, during this resuscitation process, the resuscitation control box instructs the rescuer to press the "READY" button so that a defibrillation shock can be applied, the rescuer will likely feel comfortable allowing the shock to be applied to the patient. Basically, the resuscitation assembly simply tells the rescuer what to do, and by that point, given that the rescuer is already using the assembly, the rescuer is likely simply to do what the rescuer is told to do. Essentially, the rescuer will be likely to view the resuscitation assembly as simply being a sophisticated CPR prompting device with an additional feature incorporated into it, and since rescuers are less likely to be intimidated by CPR prompting devices than AEDs, they will be likely to use the resuscitation assembly according to the invention when it is needed.

[0065] Other embodiments are within the following claims. For example, in other embodiments the system can perform pacing in addition to defibrillation. Pulse detection methods other than pulse oximetry and phonocardiogram may be employed. Any method capable of detecting a victim's pulse can be used with the aspects of the invention calling for pulse detection.

What is claimed is:

1. A resuscitation system, comprising:

at least one first high-voltage defibrillation electrode;

at least one second high-voltage defibrillation electrode; and

at least one manually operable control mechanically connected with and in the vicinity of at least one of the first and second electrodes; and

a resuscitation control system electrically connected to the first and second electrodes and the at least one manually operable control and configured to provide resuscitation prompts to a rescuer based on use of the manually operable control by the rescuer.

2. The resuscitation system of claim 1 wherein there are a plurality of manually operable controls mechanically connected with at least one of the first and second electrodes.

3. The resuscitation system of claim 1 wherein the at least one manually operable control comprises a pause control for pausing a resuscitation procedure.

4. The resuscitation system of claim 1 wherein the at least one manually operable control comprises a help button for requesting prompts from the resuscitation control system with respect to a particular aspect of resuscitation.

5. The resuscitation system of claim 4 wherein the particular aspect of resuscitation comprises clearing a patient's airway.

6. The resuscitation system of claim 4 wherein the particular aspect of resuscitation comprises assisting a patient's breathing.

7. The resuscitation system of claim 4 wherein the particular aspect of resuscitation comprises assisting a patient's circulation.

8. The resuscitation system of claim 1 wherein the first electrode is a sternum electrode and the second electrode is an apex electrode.

ZOLL 0314

9. The resuscitation system of claim 1 wherein the manually operable control is a button configured to be pushed by the user.

10. A CPR system, comprising

a CPR pad configured to be located over a region of a patient's body appropriate for CPR chest compressions;

a compression-sensing element interconnected with the CPR pad;

a resuscitation control system electrically connected to the compression-sensing element and configured to receive compression information from the compression-sensing element; and

at least one manually operable control mechanically connected with the CPR pad, wherein the resuscitation control system is electrically connected to the at least one manually operable control and is configured to provide resuscitation prompts to a rescuer based on use of the manually operable control by the rescuer.

11. The CPR system of claim 9 wherein the manually operable control is a button configured to be pushed by the user.

12. A resuscitation system comprising:

at least two defibrillation electrodes configured to be applied to the exterior of the chest of a patient for delivering a defibrillation shock;

a source of one or more ECG signals from the patient;

a defibrillation circuit for delivering a defibrillation shock to the defibrillation electrodes;

a control box that receives and processes the ECG signals to determine whether a defibrillation shock should be delivered or whether CPR should be performed, and that issues instructions to the user either to deliver a defibrillation shock or to perform CPR;

wherein the determination of whether CPR should be performed and the instructions to perform CPR can occur at substantially any point during a rescue.

13. The system of claim 12 wherein the control box includes a user operable control for initiating delivery of a defibrillation shock, and the instructions to deliver a defibrillation shock include instructions to activate the user operable control.

14. The system of claim 13 wherein the user operable control is a button configured to be pushed by the user.

15. The system of claim 12 wherein the determination of whether CPR should be performed and the instructions to perform CPR can occur before a determination to deliver any defibrillation shock.

16. The system of claim 12 wherein the source of the ECG signals is the defibrillation electrodes.

17. The system of claim 12 wherein the defibrillation circuit is contained in the control box.

* * * * *

# EXHIBIT C

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/727,265 | 12/03/2003 | Donald C. Hutchins | 02064-011001 | 4924 |

26161     7590     10/20/2004
FISH & RICHARDSON PC
225 FRANKLIN ST
BOSTON, MA 02110

RECEIVED
OCT 2 2 2004
FISH & RICHARDSON, P.C.
BOSTON OFFICE

| EXAMINER |
|---|
| HAN, JASON |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2875 | |

DATE MAILED: 10/20/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

Docketed By Practice Systems
Action Code: RESPTO VA
Base Date: 10-20-04
Due Date: 1-20-05
Deadline: 4-20-05
Initial: LMA

Docketed By Billing Secretary
Due Date: 1/20/2005
Deadline: 4/20/2005
Initials: BYB

RECEIVED BY BYB
OCT 26 2004
FISH & RICHARDSON

PTO-90C (Rev. 10/03)

| Office Action Summary | Application No. | Applicant(s) |
|---|---|---|
| | 10/727,265 | HUTCHINS, DONALD C. |
| | Examiner | Art Unit |
| | Jason M Han | 2875 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>03 December 2003</u>.
2a)☐ This action is FINAL.    2b)☒ This action is non-final.
3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

4)☒ Claim(s) <u>1-23</u> is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5)☐ Claim(s) _____ is/are allowed.
6)☒ Claim(s) <u>1-23</u> is/are rejected.
7)☐ Claim(s) _____ is/are objected to.
8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

9)☒ The specification is objected to by the Examiner.
10)☒ The drawing(s) filed on <u>03 December 2003</u> is/are: a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All b)☐ Some * c)☐ None of:
        1.☐ Certified copies of the priority documents have been received.
        2.☐ Certified copies of the priority documents have been received in Application No. _____.
        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

## Attachment(s)

1)☒ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
    Paper No(s)/Mail Date _____.
4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____.
5)☐ Notice of Informal Patent Application (PTO-152)
6)☐ Other: _____.

Application/Control Number: 10/727,265                                    Page 2

Art Unit: 2875

## DETAILED ACTION

### Drawings

1.    The drawings are objected to as failing to comply with 37 CFR 1.84(p)(5) because they do not include the following reference sign(s) mentioned in the description: Figure 4 – transistor drive output port "145". Corrected drawing sheets in compliance with 37 CFR 1.121(d) are required in reply to the Office action to avoid abandonment of the application. Any amended replacement drawing sheet should include all of the figures appearing on the immediate prior version of the sheet, even if only one figure is being amended. The replacement sheet(s) should be labeled "Replacement Sheet" in the page header (as per 37 CFR 1.84(c)) so as not to obstruct any portion of the drawing figures. If the changes are not accepted by the examiner, the applicant will be notified and informed of any required corrective action in the next Office action. The objection to the drawings will not be held in abeyance.

### Specification

2.    The title of the invention is not descriptive. A new title is required that is clearly indicative of the invention to which the claims are directed.

### Claim Rejections - 35 USC § 112

The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

3.    Claim 9 is rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Application/Control Number: 10/727,265

Art Unit: 2875

Page 3

4.    The term "substantially 10-degree light beam" in Claim 9 is a relative term which renders the claim indefinite.  The term "substantially 10-degree light beam" is not defined by the claim, the specification does not provide a standard for ascertaining the requisite degree, and one of ordinary skill in the art would not be reasonably apprised of the scope of the invention.  The above limitation does not render a clear interpretation by the examiner and is indefinite for failure to provide a clear understanding of what is claimed.  With what respect is it a 10-degree beam?

## Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

5.    Claims 1, 2, 6, 7, 11, 13, and 14 are rejected under 35 U.S.C. 103(a) as being unpatentable over Lebens et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874).

With regards to Claim 1, Lebens teaches a method and apparatus for an LED flashlight wherein a housing [Figure 1: (110)] includes a battery power source [Figure 1: (120)], a switch [Figure 1: (140)], a gallium nitride LED [Figure 1: (150); Column 6, Line 39], and a voltage converter and current regulator circuit [Figure 1: (130, 160)] electrically connected to the switch and arranged to provide a predetermined voltage and current to the LED when connected to the battery [Abstract].

Application/Control Number: 10/727,265

Art Unit: 2875

Page 4

Lebens does not specifically teach the LED flashlight having a lithium battery source. However, the examiner considers the limitation a matter of design preference as it is commonly held that lithium ion batteries are used in portable devices for their lightness and high energy density. Motivation for such a configuration is corroborated by Lebens: "In one embodiment, battery 120 includes one or more cells which can be any suitable technology such as alkaline dry cells or rechargeable cells. Alternatively, other portable DC electrical power sources can be used as desired in place of battery 120 [Column 7, Lines 33-37]."

Lebens also does not specifically teach the LED flashlight having a heat sink thermally coupled to the LED.

Petroski discloses a heat dissipation system for an LED lamp device wherein an LED [Figure 1: (12)] is thermally coupled to a heat sink [Figure 1: (20)].

It would have been obvious to modify the LED flashlight of Lebens to incorporate the heat dissipation system of Petroski, as commonly held within the art, in order to provide adequate heat dissipation for the LED and thus ensuring a high operating efficiency.

6.    With regards to Claim 2, Petroski teaches the heat dissipation system, as cited above, being made of a metal body [Figure 1: (20); Claims 3-4] and contained within the housing [Figure 1: (22)]. Though the housing is not explicitly taught as being a metal body, the examiner considers the reference functionally equivalent whereby heat is transferred from the heat sink to the outer housing via conduction [Claim 6]. It is

Application/Control Number: 10/727,265
Art Unit: 2875

Page 5

obvious that a metal material usually provides a high thermal conductivity and would be suitable as a design choice.

7.    With regards to Claim 6, and to the applicant's admission, provided a suitable switch ensuring the device is not operating, a long shelf life is obtained whereby a lithium battery provides a long life of typically at least 10 years and whereby an indium gallium nitride (InGaN) LED has an almost limitless life [Page 5, Lines 18-19].

Lebens teaches a rotary switch [Column 7, Lines 12-14], indium gallium nitride LED [Column 6, Lines 39-40], and the obvious use of a lithium battery in meeting the criteria whereby a long shelf life of at least 10 years is obtained.  It should further be noted that the examiner recognizes that the limitation states a gallium nitride LED instead of indium gallium nitride.  The examiner assumes that the two have similar characteristics, and that such was the intention of the applicant to state.  If not, then the limitation lacks enablement.

8.    With regards to Claim 7, Lebens teaches the use of a reflector coupled to an LED housing for collimating the emitted light forwardly therefrom along the optical axis [Column 1, Lines 55-61; Claim 1b].

9.    With regards to Claim 11, Lebens teaches the LED being constructed and arranged to emit light waves in the blue spectrum [Column 6, Lines 37-39], which is obvious in using a GaN (gallium nitride) LED.

10.    With regards to Claim 13, Lebens teaches a circuit with a power supply and control circuit [Figure 1: (130)] in combination with a feedback control [Figure 1: (160), which regulate the light output level for the LEDs [Column 1, Lines 61-67].  It is obvious

Application/Control Number: 10/727,265                                    Page 6
Art Unit: 2875

that such a circuit and current regulator may provide 85 percent power efficiency for the device.

11.    With regards to Claim 14, Petroski teaches a heat dissipation system, as cited above, wherein an LED is mounted to a printed circuit board [Figure 1: (26)] that has a thermally conductive path coupled to the LED and a metal body of the housing [Claims 1-9].

12.    Claims 3-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Lebens et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874) as applied to Claim 1 above, and further in view of Matthews (U.S. Patent 5629105).

       Lebens in view of Petroski teach an LED flashlight as cited above.

       Neither Lebens nor Petroski specifically teach the flashlight having a switch with threaded means (i.e. rotary switch).

       Matthews teaches a flashlight with a rotary switch wherein a transducer mount [Figure 1: (17)] provides threaded means [Figure 1: (48)] for attaching to a battery housing/support [Figure 1: (16, 31)], and whereby a battery source [Figure 1: (11)] is urged to make electrical communication [Figure 1: (18)] in powering a lamp(s) [Figure 1: (12 13)]. Matthew further teaches an insulating disc [Figure 1: (54)] with a protrusion [Figure 1: (56)], which is functionally equivalent to a compressed rubber ring in urging the battery away from the circuit contact [Figure 1: (18)] when the threaded parts are being disengaged.

       It would have been obvious to modify the LED flashlight of Lebens with the heat dissipation of Petroski to further incorporate the rotary switch of Matthews, as commonly

Application/Control Number: 10/727,265                                    Page 7
Art Unit: 2875

held within the art, in order to provide multiple switching characteristics and prevent

accidental usage of the flashlight. In addition, motivation for such a configuration is

corroborated by Lebens: "A variance of this embodiment uses a thumbwheel, or rotary

switch to vary the switching characteristics to produce a variable light output [Column 7,

Lines 12-14]."

13.    Claims 8-9 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Lebens et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874) as

applied to Claim 7 above, and further in view of Roller (U.S. Patent 6414801).

14.    With regards to Claim 8, Lebens in view of Petroski teach an LED flashlight with

a collimator optically coupled to the LED as cited above.

    Neither Leben nor Petroski teach the collimator having an optical-grade-acrylic-

plastic.

    Roller teaches an LED assembly having a collimator made of acrylic plastic

disposed in front of the LEDs [Column 5, Lines 54-56].

    It would have been obvious to modify the LED flashlight of Lebens with the heat

dissipation of Petroski to further incorporate the acrylic plastic collimator of Roller in

order to optically enhance the emitted light to a desired preference. Such a

configuration is commonly held in the art whereby a collimator lens is used to focus a

light beam generated by a light source (e.g. LED). It is also obvious that the collimator

should be formed of a rigid and durable plastic material to ensure resistance and

protection from impact of the lamp.

Application/Control Number: 10/727,265
Art Unit: 2875

Page 8

15.    With regards to Claim 9, the examiner considers the above reference functionally equivalent and obvious whereby a collimator is commonly held within the art in focusing a light beam to a desired preference.  Such is a preference is a matter of optics.  It should further be noted that many flashlights exist wherein a lens is mounted in front of a light source and adjusted to either widen or narrow a beam of light.

16.    Claim 10 is rejected under 35 U.S.C. 103(a) as being unpatentable over Lebens et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874) and Roller (U.S. Patent 6414801) as applied to Claim 7 above, and further in view of Yoon (U.S. Publication 2003/0189826).

Lebens in view of Petroski and Roller teach an LED flashlight with an acrylic plastic collimator mounted in front of the LED.

Lebens, Petroski, nor Roller specifically teach the collimator integrally coupled to the housing.

Yoon teaches an LED lamp with a collimator [Figure 5A: (260)] integrally coupled to the housing, and which further acts as a protective shield and support for the LED [Figure 5A: (236)].

It would have been obvious to modify the LED flashlight of Lebens with the heat dissipation of Petroski and the acrylic plastic collimator of Roller to further incorporate the integrally coupled collimator, as taught by Yoon, in order to facilitate an easier assembling work by reducing the number of parts thereof [Page 1, Paragraph 15 of Yoon].

Application/Control Number: 10/727,265                                              Page 9
Art Unit: 2875

17.    Claim 12 is rejected under 35 U.S.C. 103(a) as being unpatentable over Lebens

et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874) as applied to

Claim 1 above, and further in view of Parsons et al. (U.S. Patent 6789917).

        Lebens in view of Petroski teach an LED flashlight.

        Neither Lebens nor Petroski specifically teach the LED having a brightness that

can be seen from a distance of over one mile.

        Parsons discloses a dual mode rechargeable flashlight wherein a high luminous

intensity LED, when energized, produces a high intensity signal that may be visually

seen from approximately one mile away [Column 10, Lines 42-48].

        It would have been obvious to modify the LED flashlight of Lebens with the heat

dissipation of Petroski to further incorporate the high luminous intensity LED of Parsons,

so as to ensure a bright and powerful illumination is provided by the flashlight.  Such a

configuration is a matter of design preference.

18.    Claims 15-17 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Lebens et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874) as

applied to Claim 14 above, and further in view of Yoon (U.S. Publication

2003/0189826).

19.    With regards to Claim 15, Lebens in view of Petroski teach an LED flashlight, as

cited above, with a printed circuit board (PCB) where the LED is mounted on.

        Neither Lebens nor Petroski specifically teach the holder for the PCB having

multiple passage ways where a wire is passed there through in providing an electrical

Application/Control Number: 10/727,265                                    Page 10
Art Unit: 2875

communication between the PCB and battery, and whereby the wire is stored within a cavity defined by a housing.

Yoon discloses an LED flashlight with heat discharging means wherein the LED [Figure 2: (236)] is connected to a circuit board [Figure 2: (232)]. Yoon further teaches an inner cavity [Figure 2: (220, 270)] defined by the housing wherein an electrical communication between the circuit board and power source is provided by conductors/connecters [Figure 2: (240, 250)] aligned with multiple passage ways/terminals [Figure 2: (222, 239a)].

It would have been obvious to modify the LED flashlight of Lebens with the heat dissipation of Petroski to further incorporate the heat discharging/electrical communication means of Yoon in providing multiple passage ways, so that greater thermal communication may improve the heat dissipation for the LED. Such a configuration ensures an efficient LED, which is affected by variation in temperature. Please further note Page 1, Paragraph 7 of Yoon, who teaches, "According to a conventional structure of the LED flashlight using one LED, lead wires of the LED are inserted into a lamp holder and extended rearwards. Then, the extended lead wires are bent and electrically connected to a positive or a negative electrode of a battery by a switching operation. However, the conventional LED flashlight requires a great number of parts for connecting the electrodes and the lead wires, so an assembling process thereof is very complicated."

Application/Control Number: 10/727,265                                Page 11
Art Unit: 2875

20.     With regards to Claim 16, Yoon teaches the heat discharging/electrical

communication means, as cited above, having a housing formed of a metal conductive

barrel/column [Figure 2: (100); Page 2, Paragraph 31].

21.     With regards to Claim 17, Lebens teaches the use of a rotary switch [Column 7,

Lines 12-14]. Such a device is commonly held in turning flashlights on/off without the

use of any switches/buttons external to a housing.

22.     Claims 18-20 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Lebens et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874) as

applied to Claim 1 above, and further in view of Bowman et al. (U.S. Patent 6791283).

23.     With regard to Claims 18-19, Lebens in view of Petroski, as cited above, teach

an LED flashlight with a voltage converter and current regulator circuit in addition to a

circuit board [Figure 1: (26) of Petroski] where the LED is mounted on.

        Neither Lebens nor Petroski specifically teach the circuit board having the

voltage converter and current regulator circuit.

        Bowman teaches an LED illumination module wherein a circuit board [Figure 3B:

(302)] is mounted with LEDs [Figure 3B: (102a-n)] and a voltage converter and current

regulator [Figures 1-2] circuit. Bowman further teaches that the electronic circuitry may

be assembled on one side of the circuit board [Column 8, Line 59 – Column 9, Line 13].

        It would have been obvious to modify the LED flashlight of Lebens with the heat

dissipation means of Petroski and Yoon to further incorporate the illumination module of

Bowman in order to provide a small, compact, and easier assembly. It is also obvious

that the assembly would provide electrical connection means between the circuit board

and the battery, which is commonly seen in the art with wires, conductors, connectors, and/or conductive housing.

24.    With regards to Claim 20, both Lebens [Figure 2] and Bowman [Figures 1-2] teach a voltage converter and current regulator circuit whereby a certain predetermined voltage is provided for use by the LED(s).  The examiner considers the above references functionally equivalent, whereby it is obvious and commonly seen in the art that voltage boosters or step-up circuits are provided in powering LED lamps.  Thereby with respect to actual voltage output, the examiner considers such a matter of design preference whereby voltage is dependent on the number of LEDs utilized as well as the illumination intensity desired for said LEDs.

25.    Claims 21-22 are rejected under 35 U.S.C. 103(a) as being unpatentable over Lebens et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874) as applied to Claim 1 above, and further in view of Kim et al. (U.S. Publication 2004/0140771).

Lebens in view of Petroski teach an LED flashlight with a gallium nitride LED and a lithium battery as cited above.

Neither Lebens nor Petroski teach the LED being one-watt and powered by a three-volt lithium battery.

Kim teaches a flashlight that utilizes a one-watt Luxeon Star LED powered by a three-volt lithium battery [Page 6, Paragraph 79].

The examiner considers the above components/limitations a matter of design preference.  Still, it would have been obvious to modify the LED flashlight of Lebens

Application/Control Number: 10/727,265                                    Page 13
Art Unit: 2875

with the heat dissipation of Petroski to further incorporate the one-watt LED of Kim to

provide a powerful illumination, as well as, the three-volt lithium battery in providing a

environmentally safe (no mercury, lead, or cadmium), lightweight, and high energy

density power source. It is also obvious that given the power supply and control circuit

of Lebens, that the three-volt lithium battery could provide at least six hours of

illumination for the one-watt gallium nitride LED (similar characteristics to applicant's

disclosure and claim).

26.    Claim 23 is rejected under 35 U.S.C. 103(a) as being unpatentable over Lebens

et al. (U.S. Patent 6095661) in view of Petroski (U.S. Patent 6481874) as applied to

Claim 1 above, and further in view of Emile, Jr. et al. (U.S. Patent 4386308).

      Lebens in view of Petroski teach an LED flashlight with a voltage converter and

current regulator circuit as cited above, and further connected to a switch for turning the

flashlight on/off.

      Neither Lebens nor Petroski teach the voltage converter and current regulator

circuit utilizing a Schottky type diode or an inductor. It should however be noted that the

examiner considers the above references functionally equivalent in providing a

controlling means for the illumination of the LED by the power source, which is

commonly seen within the art.

      Emile teaches a voltage converter and current regulator circuit having an inductor

[Figure 1: (T1)]; a Schottky type diode [Figure 1: (16)] whose anode side is electrically

connected to the inductor; a current sensing resistor [Figure 1: (38)] electrically

connected to an LED [Figure 1: (36)]; an output capacitor [Figure 1: (18)] electrically

Application/Control Number: 10/727,265
Art Unit: 2875

Page 14

connected to the anode side of the Schottky type diode; a switching transistor electrically connected to the anode side of the Schottky type diode; and a voltage converter and current regulator controller [Figure 1: (42)] wherein a voltage sense port is electrically connected to the inductor, a current sensing port is electrically connected to the current sensing resistor, and a transistor driving port is electrically connected to the switching transistor.

It would have been obvious to modify the LED flashlight of Lebens with the heat dissipation of Petroski to further incorporate the voltage converter and current regulator circuit of Emile in order to provide the flashlight with a battery charger [see Abstract of Emile].

### Conclusion

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

The following references have been further cited to show the state of the art pertinent to the current application:

U.S. Patent 3628243 to Phol et al.;      U.S. Patent 4577263 to Maglica;

U.S. Patent 5535230 to Abe;       U.S. Patent 5803579 to Turnbull et al.;

U.S. Patent 5842779 to Siebert;      U.S. Patent 5882106 to Galli;

U.S. Patent 6150774 to Mueller et al.;   U.S. Patent 6332693 to Dove et al.;

U.S. Patent 6366028 to Wener et al.;   U.S. Patent 6396137 to Klughart;

U.S. Patent 6464373 to Petrick;      U.S. Patent 6541800 to Barnett et al.;

U.S. Patent 6625556 to Galli;       U.S. Patent 6633120 to Salam;

Application/Control Number: 10/727,265                                    Page 15
Art Unit: 2875

U.S. Patent 6793366 to Chun;          U.S. Patent 5175528 to Choi et al.;

U.S. Patent 5648714 to Eryou et al.;   U.S. Patent 5565839 to Poss;

U.S. Publication 2002/0159270 to Lynam et al.;

U.S. Publication 2003/0107885 to Galli.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Jason M Han whose telephone number is (571) 272-2207. The examiner can normally be reached on 8:00am-5:00pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Sandra O'Shea can be reached on (571) 272-2378.  The fax phone number for the organization where this application or proceeding is assigned is 703-872-9306.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

JMH

JOHN ANTHONY WARD
PRIMARY EXAMINER

### Notice of References Cited

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10/727,265 | HUTCHINS, DONALD C. |
| | Examiner | Art Unit | |
| | Jason M Han | 2875 | Page 1 of 3 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-3,628,243 | 12-1971 | Phol et al. | 29/849 |
| | B | US-4,577,263 | 03-1986 | Maglica, Anthony | 362/187 |
| | C | US-5,535,230 | 07-1996 | Abe, Tadashi | 372/43 |
| | D | US-5,629,105 | 05-1997 | Matthews, John W. | 429/97 |
| | E | US-5,803,579 | 09-1998 | Turnbull et al. | 362/516 |
| | F | US-5,842,779 | 12-1998 | Siebert, Benjamine J. | 362/309 |
| | G | US-5,882,106 | 03-1999 | Galli, Robert | 362/259 |
| | H | US-6,095,661 | 08-2000 | Lebens et al. | 362/184 |
| | I | US-6,150,774 | 11-2000 | Mueller et al. | 315/291 |
| | J | US-6,332,693 | 12-2001 | Dove et al. | 362/251 |
| | K | US-6,366,028 | 04-2002 | Wener et al. | 315/241P |
| | L | US-6,396,137 | 05-2002 | Klughart, Kevin Mark | 257/691 |
| | M | US-6,414,801 | 07-2002 | Roller, Philip C. | 359/726 |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                     Notice of References Cited              Part of Paper No. 20041011

| Notice of References Cited | Application/Control No. 10/727,265 | Applicant(s)/Patent Under Reexamination HUTCHINS, DONALD C. | |
|---|---|---|---|
| | Examiner Jason M Han | Art Unit 2875 | Page 2 of 3 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-6,464,373 | 10-2002 | Petrick, John T. | 362/235 |
| | B | US-2002/0159270 | 10-2002 | Lynam et al. | 362/492 |
| | C | US-6,481,874 | 11-2002 | Petroski, James T. | 362/373 |
| | D | US-6,541,800 | 04-2003 | Barnett et al. | 257/98 |
| | E | US-2003/0107885 | 06-2003 | Galli, Robert D. | 362/205 |
| | F | US-6,626,556 | 09-2003 | Galli, Robert D. | 362/205 |
| | G | US-2003/0189826 | 10-2003 | Yoon, Sang-Yeon | 362/205 |
| | H | US-6,633,120 | 10-2003 | Salam, Hassan P. A. | 313/499 |
| | I | US-2004/0140771 | 07-2004 | Kim et al. | 315/086 |
| | J | US-6,791,283 | 09-2004 | Bowman et al. | 315/291 |
| | K | US-6,789,917 | 09-2004 | Parsons et al. | 362/184 |
| | L | US-6,793,366 | 09-2004 | Chun, James K. | 362/184 |
| | M | US-4,386,308 | 05-1983 | Emile et al. | 320/153 |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No. 20041011

| *Notice of References Cited* | Application/Control No. 10/727,265 | Applicant(s)/Patent Under Reexamination HUTCHINS, DONALD C. | |
|---|---|---|---|
| | Examiner Jason M Han | Art Unit 2875 | Page 3 of 3 |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-5,175,528 | 12-1992 | Choi et al. | 340/331 |
| | B | US-5,648,714 | 07-1997 | Eryou et al. | 320/139 |
| | C | US-5,565,839 | 10-1996 | Poss, Glen T. | 340/331 |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No. 20041011

# EXHIBIT D

DCHCPR@mail.map.com

Menu  Compose  Search        Personal Account Options...        Help  Logout

**Donald Hutchins's Main Mail**

- Print
- Header

Message 20 of 81  ☒

FROM:  "Chuck Hieken" <Hieken@fr.com> | Save Address
DATE:  Thu, 10 Feb 2005 13:14:46 -0500
TO:  <dchcpr@map.com>
SUBJECT:  RE: 2004 Unpaid Invoices AAHUTM01

Please comment.  We can obtain extensions of time, and we will pay the
extension fees.   I would appreciate it if you could give me your comments by tomorrow so I could prepare the response over the weekend.
Regards.
          Chuck .

-----Original Message-----
From: Donald Hutchins [mailto:dchcpr@map.com]
Sent: Thursday, February 10, 2005 12:55 PM
To: Chuck Hieken
Subject: Re: 2004 Unpaid Invoices AAHUTM01

Chuck, In late December when you sent me the attached email and I talked
to you on the phone, you asked if I had seen the office action on Application 10/727,265.  Because I had not seen it, you sent me a copy
with your letter Dated January 3, 2005.  Because I have been spending
time on patent litigation, I only recently started to review the office action.  I believe that I can overcome most of the objections.
Unfortunately, I understood that I had three months to reply.  Only last
night I realized that your letter said three months after October 20, 2004.  I don't know why your office held this for so long before it was
sent to me.  Is the opportunity to reply lapsed?  Sshould I continue to
examine the issues or am I wasting my time?  Best regards, Don Hutchins

---------- Original Message ---------------------------------
From: "Chuck Hieken" <Hieken@fr.com>
Date: Mon, 27 Dec 2004 16:25:25 -0500

# EXHIBIT E

**Donald C. Hutchins**
**1047 Longmeadow Street**
**Longmeadow, MA 01106**

February 23, 2005

Fish & Richardson, P.C.
225 Franklin Street
Boston, Massachusetts 02110-2804

Attn:   Robert E. Hillman, Esq., Chairman

Dear Attorney Hillman:

I have been a client of Chuck Hieken's for over 20 years starting when I visited his offices on Totten Pond Road.  I have great admiration for Chuck both as a person and an excellent patent attorney.  His work has provided me with multiple U.S. and foreign patents and a number of trademark registrations.  Chuck has written these intellectual properties to allow the patents to be granted and upheld in both patent office and civil challenges.  My payments over the past 15 years to Fish & Richardson for fees and patent office interference/reissue actions have exceeded $200,000.

Currently I am participating in Civil Actions 04-30121 MAP and 04-30126-MAP in the United States District Court for the District of Massachusetts.  I have recently completed the claim construction documents in preparation for Packer hearings.  I mention this so that you may realize that I am very familiar with and have read hundreds of patents.  I am not a tinker, I am a business man who has developed unique products to fill a need.  All of my inventions have become marketable and licensed products.

In the aftermath of the Warwick, Rhode Island nightclub fire, it haunted me that people were trapped in dark, smoke-filled conditions without sufficient light to guide their escape.  I realized the need for a small light that could decorate an office desk, coffee table or nightstand and be available when needed.  As a result, I spent a year in research and was able to develop a small LED light that has the beam of a large flashlight and will shine for over 6 hours on one lithium #123 battery.  I named this light the *JeanieLite*™ in honor of my friend Jean Roger, a flight attendant who died on the American Airlines flight out of Boston on September 11th.  After a very successful test market we are negotiating the sale of the *JeanieLite*™ product line and the technology that drives it to an international marketer of high end products.  Certainly, part of the value of this sale includes the prospect of the allowance of the patent that is pending.

1

While flashlights are plentiful and inexpensive, they are usually tucked away and difficult to find in an emergency. Flashlights that can provide a beam sufficient to light an escape route are large and have a utilitarian appearance so they are not placed on desks and furniture. Many keychain lights are on the market, however the weak beam provided by the small LED are inadequate for emergency use. There are flashlights on the market that use five or six small LEDs to equal one incandescent flashlight bulb. I was challenged to develop a small, attractive light that did not look like a flashlight but which could provide a beam equal to a large flashlight. This light would also need to have a very long shelf life and provide at least two hours of battery life.

In 2002 Phillips introduced to market a powerful 1-watt LED called the *Luxeon Emitter* for use in large billboards and traffic lights. The light provided by one *Luxeon Emitter* exceeded that of large flashlights. While this 1-watt LED presented me with the foundation for an escape light, it carried a number of problems, such as: (1) If the *Luxeon Emitter* overheated it would destroy itself; (2) The *Luxeon Emitter* would not operate at 1.5 volts, the standard for flashlight batteries: (3) The *Luxeon Emitter* specifications called for large heat sinks to dissipate the heat (This was not a problem in billboards because the billboards had adequate space for heat exchangers); (4) The *Luxeon Emitter* must be mounted on a circuit board with a circuit to control the current and voltage produced by a 3-volt lithium battery; (5) No one had harnessed the *Luxeon Emitter* for use in a small, battery operated, portable light.

On August 28, 2003 I met with Attorney Chuck Hieken at the Fish & Richardson office to discuss his desire not to participate in a patent license study that involved my patents, Attorney Lee and the Zoll Medical Corporation. Realizing that Zoll Medical is also a client of Fish & Richardson, Chuck saw this as a conflict of interest that could lead to future problems. I understood and accepted his position and so informed Zoll. When the meeting ended, Chuck asked if I had anything new that I was working on. I was happy to show him a working model of the *JeanieLite*™. He reacted with great enthusiasm and asked to buy one when they went on the market. He then said that he felt that the light was innovative and could be patented. He encouraged me to do a search and get back to him.

I have found that a patent can be both a curse and a blessing for the individual inventor. The cost of developing and marketing a patented product can be overwhelming. The cost of defending patents is prohibitive. The value of a patent lies in the opportunity of selling the patent and product as a package to investors or a large corporation. I look upon a patent as personal property that enhances the value of the total package that would include designs, test marketing, tooling and inventory. Investors look upon the patent as a magic glue that holds the concept together and protects the concept from competitors. With this in mind, I believed it would be worth the time and cost to follow Chuck's suggestion and apply for a *JeanieLite*™ patent.

A letter written on September 18, 2003 that I have attached as Exhibit #1, includes my instructions and material that I wrote called, "Portable Escape Light Patent".

The covering letter asked that the claims not be expanded from those I had written and that Fish & Richardson use the Abstract, Background, Summary and Description of the Drawings that I prepared.

In time I received a request from an Attorney David Miranda who had been assigned the task of writing the application. Attorney Miranda asked me to redraw the drawings to accommodate the expanded description that he had created for the application. He later sent me the description and drawings with a request to review for errors. Because I found the description and drawings to be technically correct, I approved. Later Attorney Miranda sent me the Information Disclosure Statement and other documents for my signature. On December 3, 2003 Attorney Miranda sent me a letter informing me that an application had been filed and that I could now use the phrase "patent pending" in advertising and on the invention.

This was good news and allowed us to continue the limited production and sales of the *JeanieLite™*. Among the first customers was Chuck Hieken and others at Fish & Richardson. The finished product is almost identical to the invention that I described in my "Portable Escape Light Patent" document sent to Chuck on September 18, 2003. Test Market sales of the *JeanieLite™* were excellent and led to an article, Exhibit #3, in the October issue of *Discover Magazine*. Now we are discussing sale of this invention to *Coach*, the upscale marketer of leather goods that has done so well developing a market for its new line of watches. I have included a *JeanieLite™* with this letter.

I understood that there is no assurance that a patent would be granted, or, if granted, its validity would be upheld or interpreted with sufficient breadth to prevent competition with the invention. I also knew that there would be a wait of 12 to 18 months before a reply from the examiner. It had been my experience that the examiner would reply with some objections to the claims and a number of problems with the drawings. As months passed, I was encouraged by the fact that the *JeanieLite™* was well received by the public and that the product performed well with no returns for repairs or corrections. Also, there were no competitive patent applications for portable rescue lights and no competitive products entered the market.

I never met with Attorney Miranda or discussed the escape light concept with him. However, I had written a very thorough Summary that alluded to the panic of being without light during the Rhode Island nightclub fire and included sixteen objects of the invention. Attorney Hieken had always used my wording for the Background and Summary of past inventions so I assumed that Attorney Miranda would follow the same pattern. This Summary plus a circuit description and the revised drawings were sent to Miranda September 18, 2003 as printouts and also as "Microsoft Word" files on a diskette. While I was surprised that he needed the circuit design in such detail, I assumed that he needed the information to flesh out the Application. By this time Attorney Hieken had purchased seven *JeanieLites™* for himself, his secretary and others at Fish & Richardson, so I knew that the escape light concept was well understood in the office. Attorney Miranda put so much emphasis on the technology in the Description and Drawings of the Invention that we never discussed the remainder of the Application.

Looking back I realize that Attorney Miranda must have lost the part of the draft that included my Background, Summary and sixteen objects and with it the innovative concept of an escape light.

In late December of 2004 Chuck Hieken called to inquire about a balance on my Fish & Richardson account of $409.50 that was outstanding. Because I had no record of the billing, I asked for copies of the billing that he forwarded by email on December 27, 2004. During the telephone conversation Chuck asked if I had seen the Office Action on the escape light application. When I said that I had not seen it, he said that we had three months to reply and sent the documents that I have included as Exhibit #2. Because I was busy writing claim constructions and other discovery documents for my patent cases currently being litigated and because we had the three months to reply, I did not review the Office Action until February 10th.

The covering letter recited so many formal rejections, I jumped past the "Office Action Summary" to page 2, the "Detailed Action." My experience is that the examiners usually find fault with the drawings because patent drawings use an archaic format and are very dissimilar to modern technical drawings. It did not bother me that the examiner required changes in the drawings.

Next, I noted that the examiner found the title to be, ". . . **not descriptive. A new title is required that is clearly indicative of the invention to which the claims are directed."** I did not understand when I first read the Office Action that Attorney Miranda had substituted the title, "Lighting" rather than the title "Portable Escape Light" that I had suggested.

Next I read a quotation from 35 USC PARAGRAPH 112 that the examiner furnished: "**The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."** I had never seen an Office Action with this kind of instruction for the applicant. I could not understand why the Examiner was reacting in this manner. It was like a grade school teacher telling a 4th grade student to put a title on a term paper.

Now I went into panic mode and returned to Chuck's covering letter and the first few pages of the material. At that point I realized that this Office Action was received by Fish & Richardson on October 22, 2004 and that the due date was January 20, 2005. The three months that I was told that I had for a reply had passed. When I called Attorney Miranda, I was told that he had left Fish & Richardson over a year ago. It is obvious that the Fish & Richardson patent application system has broken down. For almost three months this Office Action was lost in the system and as a result my opportunity for a patent on the *JeanieLite*™ has been derailed.

Feeling that there may be an opportunity to request an extension of time to reply to the Office Action, I continued to review the examiner's Claims rejections. The examiner used Lebens as a primary reference. Lebens title is "Method and Apparatus for an L.E.D. Flashlight." Because the title I presented to Fish & Richardson as shown in

4

Exhibit #1 was "Portable Escape Light" I could not understand the problem. At this point, I decided to compare the Office Action to the drawings and technical description that Attorney Miranda had sent for my approval. I also reviewed a copy of the Application that he filed on December 3, 2003. It became clear that the Application that Attorney Miranda had filed on December 3, 2003 bore little resemblance to my invention. It appeared that he had filed only the technical description and drawings that I had approved and created a set of Claims that had little relation to my invention. The document Attorney Miranda filed had no reference to a portable escape light. His title was "Lighting". His Abstract had no reference to a portable escape light. Now I realized why the examiner had so many rejections. Attorney Miranda became so involved with the technical description and drawings that the concept of an escape light was abandoned. The words "escape light" can not be found in the Application. He had filed an application for a "Lighting" apparatus that included an LED powered by a lithium battery. Miranda's terms used in the Application are so broad, there are probably 10 LED lighting patents that the Examiner could have used as the basis for his formal objections.

I agree with most of the Examiner's findings as recorded in the Office Action. I understand how the Examiner found the title to be "not descriptive". I agree that the Claims filed by Attorney Miranda are indefinite and unpatentable over Lebens in view of Petroski, Mathews, Roller and Yoon. It is now clear that Attorney Miranda never understood my invention and as a consequence failed in describing my invention by means of the Application. Attorney Miranda has failed me and Fish & Richardson through his unprofessional efforts to obtain a patent on an invention that Chuck Hieken proposed to be patentable.

To understand my disappointment in Attorney Miranda's failing effort, please read the claim construction analysis that I have prepared comparing Lebens to the escape light patent that I proposed to Chuck Hieken September 18, 2003 attached as Exhibit #1. As you can see, I would have no problem defending my claims that the Examiner considered unpatentable over Lebens. Without Lebens, the Examiner's other referenced patents that he combines with Lebens, are simply scattered bits of technology found in many electronic and LED applications.

## CLAIM CONSTRUCTION ANALYSIS
## HUTCHINS compared to LEBENS

HUTCHINS [54] TITLE:    **PORTABLE ESCAPE LIGHT**

LEBENS [54] TLTLE:    **METHOD AND APPARATUS FOR AN L.E.D. FLASHLIGHT**

My Company, Hutchins Tool manufactures medical parts as a sub-contractor to Johnson & Johnson, DePuy, U.S. Surgical, etc. Quality is of such importance Hutchins Tool has developed a quality control manual with over 200 pages. We are subject to yearly three-day audits from J&J which cover many areas including employee training and the measure of employee performance. Invariably these audits uncover problem areas that need attention. While, I do not expect that Fish & Richardson has such an extensive quality system in place, I expect that you must employ some system to oversee the work of associates and to insure that Patent Office Actions are responded to in a timely manner. If these systems are in place, there has been negligence on the part of Fish & Richardson in their application and enforcement.

Because the *JeanieLite*™ has been on the market for some time, I have lost the opportunity to use an alternative patent law firm to correct Attorney Miranda's errors. As a result, I expect that the opportunity to obtain a patent on my invention has been lost. Even if Fish & Richardson could gain an extension from the Patent Office, the original application was so poorly drawn, I assume it would be impossible to adapt the application to allowable form.

I request that you circulate this letter among the principals of Fish & Richardson. First, I feel that to sustain the good reputation of Fish & Richardson your principals should evaluate the performance of Attorney Miranda and the systemic problems with your "Practice Systems" Section. Second, I ask that you determine a course of action that will allow Fish & Richardson to meet its obligations to me as a client of over 20 year standing.

If you agree that there is no hope of gaining a patent, please let me know. If you suggest that I submit a claim for restitution to your insurance carrier, please guide me through the process. If Fish & Richardson is willing to underwrite the cost of re-submittal and can persuade the Examiner that the original application was flawed, I would be happy to work with you.

Sincerely yours,

Donald C. Hutchins

enc:    1 - *JeanieLite*™

# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD C. HUTCHINS | ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. No. 05-30062-MAP |
| | ) |
| FISH & RICHARDSON, P.C. | ) |
| Defendant | ) |

## AFFIDAVIT

NOW COMES DONALD C. HUTCHINS and upon being duly sworn, states that:

1.  I am over 18 years of age and have personal knowledge of the matters attested to herein.

2.  On August 28, 2003 I met with Attorney Chuck Hieken ("Hieken") at the offices of Fish & Richardson, P.C. ("F&R") to discuss Hieken's concerns that there was a conflict of interest between Hutchins and the Zoll Medical Corporation within the F&R office. Hieken explained that Attorney G. Roger Lee, a partner at F&R was preparing patent applications for an innovative Zoll defibrillator that included voice and graphic cardiopulmonary prompting (CPR). Hieken's concern was that Attorney Lee had access to privileged information used in the filing of my properties such as Hutchins' Patents No. Re. 34,800 and 5,913,685 and also Hutchins' Copyrights Registration No. TXu-210-208 and No. TXu-213-859.

3.  On September 22, 2003 Gary Freeman, the V.P. of Clinical Affairs at Zoll induced Hutchins to participate in an Agreement to allow Attorney Lee to evaluate Hutchins' patents as part of Zoll's request to license Hutchins' Patent No. 5,913,685.

4.   Discovery in Civil Action 04-30121-MAP, <u>Donald C. Hutchins vs. Zoll Medical Corporation</u>, reveals that Attorney Lee has participated in the drafting of patent

applications for a Zoll device named *AED Plus* and that this device includes CPR voice and graphic prompting.

5.  In Civil Action 04-30121-MAP I allege that Zoll has infringed my Patents No. Re. 34,800 and 5,913,685 and also my Copyrights Registration No. TXu-210-208 and No. TXu-213-859. Civil Action 04-30121-MAP is ongoing and the Court is currently reviewing claim construction documentation.

6.  Discovery in Civil Action 04-30121-MAP reveals that Attorney Lee had researched Hutchins' patents long before September 22, 2003 in an effort to write around Hutchins' claims as part of his efforts on behalf of Zoll's *AED Plus*. Zoll's Patent Application No. 2004/0176807 was filed March 18, 2004 lists Gary Freeman as inventor and F&R as patent counsel. The drawings, claims and description contained in Zoll's Application are thinly disguised copies embezzled from my Patent No. 5,913,685 giving evidence to the conspiracy between Zoll and F&R.

7.  The evaluation of my Patent No. 5,913,685 was nothing more than concealment to allow Attorney Lee to apply to the Patent Office for the *AED Plus* claims related to CPR voice and graphic prompting.

8.  Before I left the meeting on August 28, 2003, Attorney Hieken became excited with an "escape light" that I had developed in reaction to the September 11th twin towers disaster. Hieken asked to purchase lights from the first production runs. Before I left the office, Hieken encouraged me to do a patent search and get back to him because Hieken believed that this escape light was a patentable device.

9.  I have been a client of Attorney Hieken for over 20 years and I have paid fees to Fish & Richardson of over $200,000 in that period to obtain numerous patents, re-issue patents, copyrights, foreign patents, etc.

10. Stimulated by Attorney Hieken's belief that this "escape light" included patentable innovations, I did an exhaustive patent search. When the search showed that my "escape light" invention was unique and patentable, I wrote a draft that included the circuit design, drawings, patent search, background and objects of the invention for the "escape light". I asked F&R to write the claims because patent attorneys are better skilled than I am in phrasing claims that will

2

be accepted by Patent Office Examiners. On September 18, 2003 I sent a draft of
the patent including drawings and electrical circuit descriptions to F&R.

11.     Sometime later I received a request for additional technical data from Attorney
David Miranda ("Miranda") who was assisting Attorney Hieken with the "escape
light" patent application. In time Attorney Miranda revised the circuit
descriptions to include this revised material in the patent application. Attorney
Miranda explained in a letter to me that the application would be reviewed by the
Patent Office within 12 to 18 months.

12.     My "escape light" is named the *JeanieLite*™ in honor of Jean Roger a flight
attendant that died on September 11th on American Airlines flight 11 out of
Boston. The concept of this "escape light" became very familiar to the staff and
associates of F&R because Attorney Hieken purchased seven *JeanieLites*™ from
the initial production runs for employees of F&R. The production and marketing
of the JeanieLite continued and at the same time I negotiated with a major high-
end international specialty goods marketer for the purposes of selling the
*JeanieLite* ™ properties. The primary asset to be sold would be the *JeanieLite*
patent, which I was told by Miranda, was pending.

13.     Attorney Hieken sent me a copy of the Patent Office response to the "escape
light" patent application in a document called the "Office Action" in January of
2005. I was totally surprised when I read the Office Action and found that the
Examiner rejected the title, all the claims and had found every other aspect of the
Application incomprehensible.

14.     F&R's cover sheet showed that the Office Action was stamped as received by
F&R October 22, 2004. The stamp by F&R's Practice Systems showed a Base
Date of 10-20-04 and a Due Date of 1-20-05. This negligence by the F&R staff in
not meeting the Office Action response date alarmed me because it showed that
the three-month period for a response to the Patent Office had expired.

15.     I reacted by communicating the problem to Attorney Hieken by e-mail. When I
telephoned Attorney Miranda, I learned that Attorney Miranda was no longer
employed by F&R.

3

16. In my review of the Office Action and rejected title and claims, I found that Attorney Miranda did not use the patent draft that I had prepared and shipped to F&R on September 18, 2003. Instead of working with my draft, Miranda wrote an incomprehensible application that is totally unrelated to my "escape light' invention.

17. Unable to communicate with Miranda who was no longer with F&R, I sent a letter to Robert E. Hillman Esq. the Chairman of F&R and included an in depth and 40 page response to the Office Action. My expectation was that Attorney Hillman would take responsibility for F&R's negligent acts and press the Patent Office for an extension.

18. I could not afford to hire another patent attorney to start fresh and respond to the Office Action. F&R has not filed a response to the Office Action or requested an extension. As a result, F&R has failed in their contracted obligation to file a valid patent application and to obtain the "escape light" patent.

FURTHER AFFIANT SAYETH NAUGHT.

DONALD C. HUTCHINS

Sworn to before me and subscribed in my presence the 7TH day of July 2005.

NOTARY PUBLIC

4